[No. B022884. Second Dist., Div. Two. Mar. 24, 1988.]

KOKO KUROKAWA, Plaintiff and Appellant, v.
MELVIN C. BLUM, as Co-executor, etc., et al., Defendants and
Respondents.

COUNSEL

Marvin M. Mitchelson for Plaintiff and Appellant.

Goldberg & Andrus, Jerome Goldberg and Lesley A. Andrus for Defendants and Respondents.

OPINION

ROTH, P. J.—

### STATEMENT OF THE CASE

Plaintiff Koko Kurokawa (Kurokawa) appeals from the judgment entered in favor of defendant Robert Beaumont (Beaumont) following a hearing on Beaumont's motion for summary judgment.

Kurokawa sought in excess of $10 million in compensatory damages and $25 million in punitive damages based upon Beaumont's alleged breach of an oral agreement made in 1965 between the two to cohabit, to help each other in business ventures, and to jointly accumulate, share and account for property and income. Alleging Beaumont had failed to honor his promises

upon termination of their relationship in 1981, Kurokawa filed her verified complaint on May 13, 1983, asserting causes of action for breach of contract, breach of an implied in law contract, and fraud.

Beaumont filed an answer asserting multiple affirmative defenses. After discovery was conducted, Beaumont moved for summary judgment. The hearing was conducted on June 10, 1986; the proceedings were not transcribed. The trial court granted his motion and finding a relationship between the parties had ended in 1971, all of Kurokawa's claims were barred by the statute of limitations. The court granted judgment on Beaumont's behalf. It was entered on June 30, 1986.

On August 29, 1986, Kurokawa filed a timely notice of appeal from the adverse judgment.

On February 21, 1987, Beaumont died in Nevada. In June 1987, Kurokawa filed a *sworn claim* (claim) in Beaumont's estate for $20 million. The legal theories generated by the claim are basically at variance with the three or more legal theories pleaded in Kurokawa's complaint and implemented during the summary judgment proceeding. A cursory reading of each document demonstrates an inherent improbability which impeaches Kurokawa's credibility. Each of the documents shatters the truth of the other.

The claim however, was not part of the record before the trial court when it rendered judgment. It became a part of the record during the pendency of this appeal in the following manner.

As previously noted, following the trial court's entry of summary judgment in Beaumont's behalf, Beaumont died in February 1987. While Kurokawa's appeal from that decision was pending in this court, she filed in June 1987 a sworn document, entitled "General Claim" in the Nevada probate court which had jurisdiction of Beaumont's estate. This claim was first brought to our attention by respondents (for convenience hereafter Beaumont or respondent) in August 1987 in conjunction with the request for sanctions for a frivolous appeal. Since then, Kurokawa has neither questioned the authenticity of this document nor objected to this court's use of it. In fact, in her opposition to the sanctions request, she defended her filing of said claim urging, ". . . having good faith belief in the justice of her [present] appeal, [Kurokawa] and her counsel were bound to file the claim [in Beaumont's estate], or had she gained reversal on appeal, it would perhaps have been a hollow victory without true recourse due to procedural omission to file a claim." We therefore consider it proper to comment on the claim, its contents, and its implications. The claim is attached to this opinion as Appendix I.

In July and August 1987, the parties submitted their respective briefs to this court. Beaumont requested sanctions be imposed upon Kurokawa for prosecuting a frivolous appeal. At oral argument in October 1987, we informed Kurokawa and her attorney we were of the opinion her appeal lacked merit and was frivolous. The matter was continued, additional briefing was submitted on that point, and at the November 1987 hearing testimony was taken.

## II

### PROCEDURAL AND FACTUAL BACKGROUND

Although not expressly referenced in her complaint, Kurokawa's action is essentially based upon our Supreme Court's holding in *Marvin* v. *Marvin* (1976) 18 Cal.3d 660 [134 Cal.Rptr. 815, 557 P.2d 106]. *Marvin* held the provisions of the Family Law Act were inapplicable to the distribution of property acquired by a couple in a nonmatrimonial relationship. Instead, an individual's rights in that situation would be based upon enforcement of an express or implied agreement between the nonmarital partners concerning distribution of property as well as theories of partnership or joint venture. (*Id.,* at p. 674.)

The specifics of Kurokawa's breach of contract claim are set forth in the following paragraphs of her complaint: "5. . . . [i]n or about August of 1965, Plaintiff and Defendant entered into an oral agreement whereby it was expressly agreed and understood that Plaintiff would devote her full time and attention to caring for Defendant BEAUMONT'S needs as his business partner, social hostess, companion, homemaker, decorator, confidant, but not limited to such functions, during the period of time that she lived with Defendant BEAUMONT and/or at all times that Plaintiff continued to provide the services hereinabove alleged at the request of Defendant BEAUMONT . . . .

"During the period . . . Plaintiff and Defendant BEAUMONT agreed that in consideration for the *services* which Plaintiff provided to Defendant BEAUMONT, Plaintiff and Defendant BEAUMONT *would combine their efforts and earnings and share equally* . . . in any and all property acquired as a result of the individual or combined efforts including all additions thereto, or improvements thereof, and the rents, issues and profits therefrom, and that Defendant BEAUMONT would contribute to the support and maintenance of Plaintiff *to assure Plaintiff that she would be able to maintain her life in the same style and manner that was and would be established during the time that the parties lived together.*

"6. *As further consideration,* Defendant BEAUMONT requested Plaintiff to protect BEAUMONT from *various matters which would generate adverse publicity,* on a case by case basis in return for which, Defendant BEAUMONT would continue to finance as may be necessary, the fashion business of Plaintiff to assure that [her] fashion business *would always be solvent* and that plaintiff would not be in need of any funds for *her personal lifestyle* or business until *at least a period of five years from April of 1981.*"

"7. [I]n reliance upon *said agreements,* Plaintiff and Defendant BEAUMONT did live together and Plaintiff did perform the services requested by Defendant BEAUMONT from and including August of 1965 to and including April of 1981." (Italics added.)

The complaint recites *three different dates* of the parties' separation: April 1981, December 1981, and July 1982. In any event, Kurokawa further alleged the parties accumulated $10 million in assets during their relationship and that commencing in July 1982, Beaumont had refused to perform his promises of sharing the accumulated property, contributing to her support, and funding her fashion business.

Additionally, the complaint asserted a theory of "Implied in Law Contract." In support thereof, it incorporated the factual allegations found in paragraphs 5 through 7 and added thereto the following assertions: "16. That between August of 1965 and July of 1982, Plaintiff and Defendant BEAUMONT lived together and maintained business relationship and a personal relationship to the same force and effect as would a couple who would have been legally married.

"17. During the course of the said period of that time the parties lived together:

"a. They purchased real and personal property.

"b. They travelled together on vacations and business trips.

"c. Plaintiff at all times acted as homemaker, cook, companion and confidant to Defendant BEAUMONT.

"d. Plaintiff and Defendant BEAUMONT mutually planned their financial future together for the rest of their lives and accordingly, Plaintiff did mutually share in the benefits of their work activities.

"e. Plaintiff, at the express request of Defendant BEAUMONT, protected Defendant from all adverse publicity and potential responsibility for actions taken by Defendant Beaumont involving third parties.

"f. Plaintiff devoted all aspects of her life to Defendant BEAUMONT'S interest and well-being to the exclusion of her own.

"g. Throughout this period of time hereinabove referred, Defendant BEAUMONT repeatedly assured Plaintiff that all of the said efforts were for both of their benefits, and that she would be secure as hereinabove alleged in paragraph 5 and that it would make no difference that Plaintiff and Defendant BEAUMONT were not legally married.

"h. Defendant BEAUMONT impliedly promised to give Plaintiff the same financial security and property rights as she would have had were the parties legally married in August of 1965 and in that connection further implied the promise to Plaintiff to give her one-half of each and all assets owned or acquired by them during the period from the time that they began living together until and including July of 1982.

"18. That as a result of the foregoing and the mutual promises that Plaintiff and Defendant BEAUMONT made to each other during the course of their relationship, Plaintiff at all times had a reasonable expectation that in case the parties were to separate, there would be an equal division of all assets owned or acquired by either Plaintiff or Defendant BEAUMONT during the course of their relationship and that Defendant BEAUMONT would pay to Plaintiff a sum for reasonable support and compensation.

"19. Defendant BEAUMONT has failed and refused and continues to fail and refuse to recognize Plaintiff's interest in said property or to pay Plaintiff one-half of the value thereof, despite Plaintiff's demands therefor, and accordingly, Defendant BEAUMONT is obligated to convey to Plaintiff one-half of said equitable property or, in the alternative, the value thereof."

Lastly, Kurokawa alleged fraud. Essentially, she claimed that when Beaumont made the purported promises, he never intended to perform them and in fact made those false representations to induce her to perform the services set forth in paragraphs 5 and 6 of her complaint. Absent those promises, Kurokawa claims she never would have rendered the services.

Beaumont's verified answer to Kurokawa's complaint denied its factual allegations and raised twelve affirmative defenses, including the statute of limitations.

The pleadings having put the case at issue, discovery commenced. In response to Beaumont's interrogatories, Kurokawa began back-stepping

from the allegations of her verified complaint. Although her complaint had asserted she and Beaumont had lived together from 1965 to 1981, she now stated they had only lived together from 1965 to 1971 and that thereafter, she had resided alone. Additionally, she conceded that in 1965, the year the parties met, she spoke approximately only 20 words of English; those words, not unexpectedly, were the most rudimentary phrases such as, hello, hi, good morning, good afternoon, yes and no. When asked who was present when the 1965 oral agreement was made and/or who would have knowledge of that agreement, Kurokawa responded: "Seymour Chotiner, Seymour's secretary, name unknown." Significantly, Kurokawa never offered any declarations from those individuals or an explanation of her inability to tender corroboration from them. Lastly, in regard to her fashion business which she had alleged in her complaint Beaumont promised to support "until at least a period of five years from April of 1981," she now stated she had commenced the business in 1974 with her only partner being one George Gaulding who contributed $120,000 and had a 50 percent interest in the business. Thus, by her own admission, Kurokawa established her fashion business had not begun until three years *after* she and Beaumont had stopped living together and it was financially backed by an individual with whom Beaumont had no connection.

Kurokawa propounded a "boiler-plate" set of 212 interrogatories to Beaumont. Beaumont objected to the bulk of them for detailed reasons. Kurokawa's failure to file a motion to compel him to answer concedes the legality and propriety of his objections.

His responses reveal the following: Beaumont conceded he had lived with Kurokawa but asserted it was for the period of August 1966 to October 1968 at which time he gave her "some money, and she returned to Japan." He had seen her, he said, at two chance and brief encounters at public places. He denied he had any agreement with her, oral or written, to share any property and earnings. During their two-year cohabitation, they did not participate in any business ventures nor did they have any joint bank accounts. Kurokawa, whom he never referred to as his "wife," made no financial contribution towards their joint expenses nor did she ever make any expenditures on his behalf. In 1977, Beaumont moved to Nevada where he married in 1979 and had a child.

Nowhere other than in the allegations found in her complaint did Kurokawa offer any proof, either by way of documentary evidence or through declarations, that during the two-year period in which Beaumont admitted they lived together and/or the longer period she alleges they cohabited, there was a sharing of earnings of any joint venture or of an independent business owned by just one of them or that they held any property jointly.

Despite the flimsy nature of her declaration, Beaumont never posed any objection to the trial court's use of it nor did the trial court strike any evidence offered by her. Thus, any proof of her claimed rights, which Kurokawa had to corroborate, rested on her numerous ipse dixits which merely generated a relationship which does not remotely resemble any of the varied legal relationships she asserted or pleaded.

Beaumont moved for summary judgment asserting the statute of limitations barred Kurokawa's claims because by her own admissions, the parties had separated in 1971 but her lawsuit was not filed until 1983. In support thereof, Beaumont executed a declaration which essentially reiterated the information found in his responses to Kurokawa's interrogatories. That is, after the two had met in Japan in 1966, Kurokawa came to the United States and they lived together from August 1966 to October 1968. Upon separation, he gave her $5,000. He emphatically denied any agreement between the two to share property or any promise by him to support her and cogently pointed out that at the time their cohabitation began, they "did not even have the language capability to communicate such an agreement to each other."

On the record before it, the trial court correctly found whatever relationship had existed had expired and terminated in 1971. Thus, in 1986, Kurokawa, after fifteen years, suddenly reached a decision to overcome the bar of the statute of limitations—her only chance—by opposing Beaumont's summary judgment motion with the following declaration: "3. From August 1965 through January 1971 I lived with Beaumont on St. Ives Street in Los Angeles.

"4. In 1969 and 1970, Beaumont did take care of me as promised and as alleged in my complaint.

"5. In January 1971, Beaumont decided to separate from me after we had an argument. I called Beaumont's attorney, Mr. Chotiner, and Beaumont and his attorney made an agreement for a separation between Beaumont and me. They never told me about the separation agreement. I never consented to the separation. The agreement was made between Beaumont and Chotiner only. They gave me $3,000 cash to live in an apartment. They translated the separation agreement to me, but I could not understand exactly what the agreement said. They also gave me the 5-karat diamond wedding ring, and my dog. They said that if after a temporary separation, a reconciliation does not work out, Beaumont will pay me $500,000. I received $3,000 from Chotiner's office on the same day they made the separation agreement. I didn't receive the separation agreement papers. After the agreement, I stayed at the Beverly Wilshire Hotel because Chotiner told me

to. I stayed at the hotel for four days, until Beaumont and Chotiner found me an apartment.

"6. I was still seeing Beaumont. He was coming to my apartment and I was going to his house."

"7. I was deported in December 1971, on Christmas Day.

"8. On June 21, 1972, I returned to the United States. I contacted Beaumont, and Beaumont said he was happy that I was back. He again promised to see that I was taken care of financially. Also, Beaumont promised to help me open a store.

"9. In 1973 I opened a business called Koko Creative Design with George Gaulding as a partner. Beaumont promised to give me financial support for my business.

"10. In 1974, Beaumont again promised to take care of me and support me. I continued to trust and believe Beaumont.

"11. Again in 1978, Beaumont promised to help me financially and keep the long-standing promises he had made while we were living together.

"12. In March 1979, Beaumont told me that I will never have to worry about money or my safety.

"13. In November 1981 I called Beaumont in Reno, Nevada while I was staying in San Francisco at the Hyatt Union Square Hotel. We had a lengthy conversation during which time Beaumont assured me of his willingness to keep his promise.

"14. In 1982, Beaumont again promised me the money that was owed to me.

"15. Thus, from 1971 through 1982, Beaumont continued his promises as outlined in this Declaration."

Based on all the facts produced during discovery and the additional evidence tendered in regard to Beaumont's summary judgment motion, the trial court issued the following ruling: "1. The following facts are undisputed:

"A. Plaintiff did not live with Defendant after January 1971.

"B. Plaintiff did not render services to Defendant as a homemaker, decorator, confidant or companion after January 1971.

"C. Plaintiff did not commence her fashion business until 1974, after the parties had separated.

"D. Plaintiff had a 50% partner in her fashion business, named George Gaulding, who invested at least $120,000 in the business.

"E. Defendant speaks no Japanese with the exception of a few words.

"F. In 1965 when the agreement was allegedly made, Plaintiff only spoke approximately 20 words of English ('hello, hi, good morning, good afternoon, yes, no').

"2. The court finds:

"A. By virtue of the above undisputed facts, the parties' relationship terminated no later than January 1971.

"B. Plaintiff's causes of action accrued no later than January 1971 upon termination of the parties' relationship in accordance with *Estate of Fincher,* (1981) 119 Cal.App.3d 343 [174 Cal.Rptr. 18] and accordingly Plaintiff's claims are barred by the applicable statutes of limitations, that is, Code of Civil Procedure §§ 339(1) and 338(4).

"C. Plaintiff has not alleged in her complaint or declarations filed in opposition to Defendant's motion for summary judgment any conduct sufficient to give rise to a defense of equitable or promissory estoppel, i.e., there are no allegations that Defendant's alleged subsequent promises to provide for Plaintiff were accompanied by partial performance, or requests to forebear suit, or the rendering of additional services by Plaintiff in reliance upon the alleged promises; consequently there are no facts sufficient to toll the statute of limitations.

"3. There being no triable issue of material fact, and no evidence to toll the respective statutes of limitations, Defendant's motion for summary judgment is granted.

"4. It is ordered that judgment be entered in accordance with this Order in favor of Defendant ROBERT BEAUMONT and against Plaintiff KOKO KUROKAWA as prayed for in the answer.

"It is ordered that Plaintiff Koko Kurokawa take nothing by her complaint, and that Defendant recover his costs in the sum of $372.95.

"Dated: JUN 30 1986."

III

THE STANDARD OF REVIEW

In 1933, the Legislature enacted Code of Civil Procedure section 437c to govern summary judgment motions. The law had been frequently amended and has generated an avalanche of litigation. Numerous opinions have followed which are not consistent in all respects.[1]

We predicate our review of the judgment entered against Kurokawa based upon our distillation of the following principles from our Supreme Court's decisions.

■ The purpose of summary judgment is to penetrate through evasive language and adept pleading in order to ascertain the existence or absence of triable issues of material fact. (*Coyne* v. *Krempels* (1950) 36 Cal.2d 257, 262-263 [223 P.2d 244].) The aim of the procedure is to discover, through the use of affidavits, whether the parties possess evidence requiring the weighing procedures of a trial. (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 20 [112 Cal.Rptr. 786, 520 P.2d 10].) ■ The affidavits of the moving party (Beaumont) are to be strictly construed and those of the opponent (Kurokawa) are to be liberally construed. (*Chern* v. *Bank of America* (1976) 15 Cal.3d 866, 873 [127 Cal.Rptr. 110, 544 P.2d 1310].) ■ Hence, summary judgment is proper only if the affidavits in support of the moving party (Beaumont) would be sufficient to sustain a judgment in his favor and his opponent (Kurokawa) does not by affidavit show facts which present a triable issue (*Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785].) In this regard, it is important to note that the party opposing a summary judgment motion (Kurokawa) *cannot* rely on allegations in her verified pleading to oppose a motion (*Joslin* v. *Marin Mun. Water Dist.* (1967) 67 Cal.2d 132, 147 [60 Cal.Rptr. 377, 429 P.2d 889].) Lastly, subdivision (b) of Code of Civil Procedure section 437c expressly authorizes a party to use information derived from discovery in litigating a summary judgment motion.

Application of these principles to the case at bench effectively nullifies the bulk of the allegations contained in Kurokawa's verified complaint. Except to the extent those allegations were factually supported by legally compe-

---

[1] A thorough historical analysis can be found in 6 Witkin, California Procedure (3d ed. 1985) Proceedings Without Trial, sections 274-315, page 573 et seq.

tent evidence contained in declarations, answers to interrogatories, or deposition testimony, they are of no moment in ruling upon the summary judgment motion. Since the object of the motion is to discover whether *proof* exists to support a claim, the adverse party (Kurokawa) *cannot* rely on her verified pleading to defeat the motion. (*Cornelison* v. *Kornbluth* (1975) 15 Cal.3d 590, 595-596 [125 Cal.Rptr. 557, 542 P.2d 981].) The sole relevance of the pleadings is to define the issues of which the summary judgment is to dispose. (*Koret of Cal., Inc.* v. *City etc. of San Francisco* (1969) 2 Cal.App.3d 87, 90 [81 Cal.Rptr. 698].)

## IV

### ANALYSIS

In granting the summary judgment motion, the trial court found the parties had ended their relationship in 1971. Although Kurokawa's verified complaint had inconsistently alleged three different dates of separation in 1981 and 1982, on this appeal she accepts the trial court's finding of 1971 as the date of separation.

■ As noted earlier, the first two causes of action in Kurokawa's complaint are denominated "breach of contract" and "implied in law contract." As to either theory, a two-year statute of limitations applies. (Code Civ. Proc., § 339, subd. 1; 3 Witkin, California Procedure (3d ed. 1985) Actions, § 99, pp. 124-125.)

Thus, when the parties separated in 1971, any cause of action Kurokawa may have had to establish any right based upon a theory of contract to a portion of the property accumulated during her relationship with Beaumont accrued at that point. (*Estate of Fincher* (1981) 119 Cal.App.3d 343, 352 [174 Cal.Rptr. 18] [hg. den.].) As the two-year time period in which to file suit on that claim had elapsed when the complaint was filed in 1983, the trial court properly found these claims were time-barred.

■ In regard to Kurokawa's third cause of action for fraud, which was based upon the claim Beaumont intentionally misrepresented to her that he would share equally with her the accumulated property and earnings if she performed the requisite services, it, too, is time-barred. An action for fraud must be commenced within three years of the discovery of the facts constituting the fraud. (Code Civ. Proc., § 338, subd. 4.) To the extent Kurokawa characterized Beaumont's promises as "fraudulent," that fact immediately became apparent upon his nonperformance in January 1971 when the parties separated. Thus, the trial court properly granted Beaumont summary judgment on this claim.

On this appeal, Kurokawa attacks the trial court's ruling by contending her declaration raised triable issues of fact as to the application of the statute of limitations to her three legal claims. We disagree.

Preliminarily, we note her declaration is nothing more than a series of ipse dixits by which she claims Beaumont made seven promises to her following the end of their relationship. She never identifies the exact date on which any of these promises was made; with one exception, she never states the particular circumstances in which the promises were made; and she never identifies anyone who was present when the promises were made.

However, bearing in mind that because the summary judgment procedure is drastic, the papers filed on behalf of the opponent (Kurokawa) are liberally construed (*Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 285 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206]) and that every reasonable doubt must be resolved in her favor (*Wiler* v. *Firestone Tire & Rubber Co.* (1979) 95 Cal.App.3d 621, 626 [157 Cal.Rptr. 248]), we will accept, for argument's sake, the truth of her claim the promises were made. Nonetheless, they still do not create any triable issues of fact, whether construed as a renewal of the primary oral contract or as a series of independent promises.

To revive an oral promise so as to eliminate the bar of the statute of limitations, the promisor (Beaumont) must make a written acknowledgement. (Code Civ. Proc., § 360.) By Kurokawa's own admission, all of Beaumont's promises were oral and hence as a matter of law insufficient to renew the time-barred primary oral contract allegedly made when the two first began cohabitation.

In order for an independent promise to be legally enforceable, there must be consideration. (Civ. Code, § 1550.) Kurokawa's recital of the series of promises makes clear each and every one of them was gratuitous. Consideration was therefore lacking so that those promises were not legally binding. (See Civ. Code, § 1605.)

Alternatively, Kurokawa urges Beaumont should be estopped to assert the defense of the statute of limitations. Estoppel can be invoked when the delay in commencing an action is induced by the defendant's conduct. (*Regus* v. *Schartkoff* (1957) 156 Cal.App.2d 382, 386-387 [319 P.2d 721].) The evidentiary predicate of Kurokawa's estoppel claim embraces the series of promises Beaumont allegedly made following their 1971 separation.

These promises do not raise a triable issue of fact on the question of estoppel. Kurokawa has not asserted the alleged promises were conditioned upon her refraining from initiating litigation or taking any action against Beaumont and that she did in reliance thereon forbear from such action.

Thus, they do not equate with anything more than a series of gratuitous oral promises which reasonably could not, and did not, cause detrimental reliance. (Cf. *Mercer* v. *Elliot* (1962) 208 Cal.App.2d 275, 281-282 [25 Cal.Rptr. 217] [defendant engaged in a series of misrepresentations and actions upon which the plaintiff detrimentally relied].)

Lastly, Kurokawa urges the promises were particularly misleading because a confidential relationship existed between her and Beaumont. However, Beaumont made the first alleged oral promise in June 1972, 18 months *after* the parties had separated in January 1971. At that juncture, no fiduciary obligation on his part inured, for any fiduciary duty which could arise from a non-marital relationship is ended upon the parties' separation. (*Estate of Fincher, supra,* 119 Cal.App.3d at pp. 352-353.)

Thus, all of Kurokawa's claims accrued in 1971. As the statute of limitations on each legal theory had expired by 1977 when Beaumont moved from California to Nevada, Beaumont's absence from the state did not trigger the tolling provisions of Code of Civil Procedure section 351.[2]

In conclusion, the trial court properly granted Beaumont summary judgment on all three causes of action. There was no conflict in the evidence regarding the defense of the statute of limitations. ■ The question was one of law to be decided by the court, not by a jury. (*Wells Fargo Bank* v. *Superior Court* (1977) 74 Cal.App.3d 890, 895 [141 Cal.Rptr. 836].) Contrary to Kurokawa's present appellate contention, the contested ruling did not improperly take away her constitutional right to a jury trial. (*Scott* v. *Farrar* (1983) 139 Cal.App.3d 462, 467 [188 Cal.Rptr. 823].)

Up to this point, we have confined our analysis to the evidence presented to the trial court and the theories advanced therein. We are confident that is a sufficient basis upon which to sustain the trial court's decision. However, because Beaumont has requested sanctions be imposed upon Kurokawa for prosecuting a frivolous appeal, we feel it is warranted to comment further on what we believe is the inherent improbability of Kurokawa's claim. In this regard, two separate points will be made.

The first is that it is basically unbelievable that in 1965 the parties ever made the purported agreement to share earnings and property as it was not until over a decade later in *Marvin* v. *Marvin, supra,* 18 Cal.3d 660, that the California Supreme Court explicitly and unequivocally placed its imprimatur on such an agreement. Moreover, it is conceded that in 1965 neither Kurokawa nor Beaumont spoke the other's language; the only common

---

[2]Code of Civil Procedure section 351 provides, in part: ". . . [I]f, after the cause of action accrues, [the defendant] departs from the State, the time of his absence is not part of the time limited for the commencement of the action."

meeting ground was body language. Not surprisingly, Kurokawa was unable to offer any independent proof of the agreement. The only "indications" of its existence are the allegations in her verified complaint. Although in her answer to an interrogatory she stated one Seymour Chotiner and his secretary were privy to the terms of the agreement, she produced no evidence from them or an explanation of her failure to do so. Thus, nothing other than her ipse dixit allegations support her claim there was ever an agreement.

Beaumont's declaration, offered to support his summary judgment motion, affirmatively denied the existence of an agreement. At that point, it was incumbent upon Kurokawa to offer proof thereof. Her answers to interrogatories and declaration failed to affirmatively allege the existence of the agreement and its terms. As noted earlier, decisional law makes clear that at that procedural juncture, Kurokawa could *not* rely upon the allegations of her verified complaint to establish an agreement had been made. Thus, on that record, the trial court could have granted Beaumont summary judgment on the basis no agreement existed had he chosen to advance that claim in support of his motion. In fact, the trial court's ruling granting Beaumont summary judgment conspicuously avoided making any finding as to whether or not there actually was an agreement and instead rested its finding on the conclusion that Kurokawa's "causes of action accrued no later than January 1971 upon termination of the parties' relationship" and hence were time-barred.

Secondly, Kurokawa's case is demolished by the claim she filed in Beaumont's estate. Notwithstanding Kurokawa's steadfast insistence on the propriety of her filing of the claim, she avoids confronting the fact that the probate claim blatantly contradicts the allegations of her verified complaint. In the underlying lawsuit, she pleaded an express agreement to provide services to Beaumont in return for an equal sharing of accumulated earnings and property, and an implied in law contract. But the probate claim alleges she and Beaumont lived together for 16 years "in all respects as husband and wife, and did enter into certain agreements. . . ." The assertion the two lived together as husband and wife and thereby intended to "create and establish the same material rights and obligations which would have arisen between them had they in fact been formally married" is completely at variance with the lawsuit's theory which was implicitly predicated upon a theory of a *Marvin* relationship. Further, the probate claim does not set forth the precise terms of the *multiple* agreements allegedly consummated. And in an effort to have it both ways, the claim further alleges Kurokawa performed valuable services for Beaumont and is entitled to compensation for the reasonable value thereof. The numerous conflicts between the assertions in this claim and that of the lawsuit are particularly egregious in

view of the fact the claim acknowledges the pendency of Kurokawa's present appeal. But nowhere has she attempted to explain why, on the one hand, on this appeal she accepts the trial court's finding she and Beaumont ended their relationship in 1971 and thus at most lived together for six years, but on the other hand asserts in the probate claim the two lived together for sixteen(!) years.

The conclusion is unavoidable Kurokawa waited until Beaumont had died to make her additional claims. She had filed her complaint in 1983, discovery was conducted in 1985, and she executed her declaration in 1986. Thus, she had three years to bring to the trial court's attention the theories advanced in the estate claim. She failed to do so and has offered no explanation for that failure. The only reason for this inaction could be a desire to wait until Beaumont was dead for then there would be no one to deny the substance of her new patently meritless claims.

In sum, the probate claim is further evidence of the complete lack of merit to Kurokawa's claim and an absence of good faith in prosecuting this appeal.

V

RESPONDENT'S REQUEST FOR SANCTIONS

■ Concurrently with the filing of his brief, respondent requested sanctions be imposed upon Kurokawa and her counsel, Marvin M. Mitchelson, for prosecuting a frivolous appeal, urging the appeal lacked factual or legal support and was prosecuted "for the sole purpose of providing a basis for [Kurokawa] to file a [$20 million] claim in the estate of [Beaumont]."

On October 22, 1987, the date set for oral argument of this appeal, we advised Mitchelson and Kurokawa, both of whom were present in court, we were of the opinion Kurokawa's position had no merit and appeared to us to be frivolous. We suggested to counsel he could proceed forthwith or, at his option, the court would continue the case for argument to November 23, 1987. Counsel elected the continuance. It was granted. A written order was promptly and personally served upon Kurokawa and Mitchelson directing each to appear on November 23, 1987, to show cause why sanctions should not be imposed. Each appeared at the November hearing. Each gave sworn testimony.

■ The question of imposing sanctions for a frivolous appeal entails resolution of competing policy interests. Our Supreme Court, in *In re Marriage of Flaherty* (1981) 31 Cal.3d 637, 647 [183 Cal.Rptr. 508, 646 P.2d 179], summarized it as follows: "Counsel face the danger of being trapped between their obligation to their clients to diligently pursue any possibly

meritorious claim, and their obligation to the judicial system to refrain from prosecuting frivolous claims. '[A]n attorney is often confronted with clashing obligations imposed by our system of justice. An attorney has an obligation not only to protect his client's interest but also to respect the legitimate interests of fellow members of the bar, judiciary, and the administration of justice.' [Citation.]

"The courts have frequently disciplined attorneys who do not adequately protect their clients' interests. [Citation.] In addition, the cases have rejected numerous attempts to hold attorneys liable for good faith decisions to assert their clients' claims. [Citations.]

"The strong public policy in favor of the peaceful resolution of disputes in the courts requires that attorneys not be deterred from pursuing legal remedies because of a fear of personal liability. To decide otherwise 'would inject undesirable self-protective reservations into the attorney's counselling role,' and prevent counsel from devoting their entire energies to their clients' interests. [Citation.] 'If the issue which the attorney is called upon to decide is fairly debatable, then under his oath of office he is not only authorized but obligated to present and urge his client's claim upon the court.' [Citations.]"

Within the past half century, cataclysmic changes have been made in decisional, statutory, and constitutional law which have created many new causes of action. Some are sound, many are unsound, and others are on the borderline. As a result, in that process the judiciary has frequently tolerated and continues to tolerate actions based upon strained evidence and unsettled legal principles.[3] The motivation for prosecution of such actions often flows from counsel's fear of running afoul of a claim of legal malpractice. As a consequence, a lawyer cannot, without risk to his standing as an attorney and his personal solvency, fail to do anything short of vigorous representation of his client.

The unsettling state of affairs confronting practioners in California is perhaps best illustrated by our Supreme Court's recent decision in *Aloy* v. *Marsh* (1985) 38 Cal.3d 413 [212 Cal.Rptr. 162, 696 P.2d 656]. The lawsuit was one for legal malpractice brought by a wife in 1980 against the attorney who had represented her in her 1971 dissolution proceedings. The trial court granted the attorney's motion for summary judgment and the wife appealed. Justice Kaus, writing for a bare majority of the California Supreme Court, found there was a triable issue of fact as to whether or not the

---

[3] As Russell Baker noted in his December 5, 1987, column in The New York Times, "Calling a lawyer is, after all, a reflexive American response nowadays to almost every trying situation. [¶] The passion for converting all problems in human relations into lawsuits is another illustration of decay in the American character. It is now so ingrained that many people won't even get married anymore without signing a contract that will justify calling on their lawyers the first time they have an argument about whose turn it is to wash the dishes."

lawyer had committed malpractice even though it was conceded the claim counsel had failed to assert in 1971 ". . . turned out to be worthless in 1981 . . . ." (*Id.,* at p. 421.)

Hence, we are left with the incongruous result an attorney may be sued for advice which turns out to be correct. The spectre of such malpractice actions no doubt contributes to encouraging counsel to maintain patently frivolous actions such as the case at bench. Thus, the judicial system must accept its responsibility for the fact that questionable lawsuits are filed in the first instance and that frivolous appeals are thereafter taken following the trial court's proper decision to terminate the action.

However, a lawyer has responsibilities as an officer of the court. "An attorney in a civil case is not a hired gun required to carry out every direction given by the client. (Bus. & Prof. Code, § 6068, subd. (c).) As a professional, counsel has a professional responsibility not to pursue an appeal that is frivolous or taken for the purpose of delay, just because the client instructs him or her to do so. (Rule 2-110(C), Rules Prof. Conduct.) ▬ Under such circumstances, the high ethical and professional standards of a member of the bar and an officer of the court require the attorney to inform the client that the attorney's professional responsibility precludes him or her from pursuing such an appeal, and to withdraw from the representation of the client." (*Cosenza* v. *Kramer* (1984) 152 Cal.App.3d 1100, 1103 [200 Cal.Rptr. 18].)

The situation at bench, has been, and will continue to be, sensitive. Solid construction and collective action from the judiciary, the bar, the public, the media and the Legislature are the sources for a cure.

▬ Generously construed, the thrust of Mitchelson's theory in the lawsuit before us appears, in effect, to be an effort to render retroactive the *Marvin* holding regardless of any bar raised by the statute of limitations to such an action.

There is, however, no resemblance between the evidence before the court in *Marvin* and the evidence before us. There is, in fact, only a complete contrast. Evidence, or the lack thereof, is the only base upon which counsel can argue evidence and a court can find facts. Wholly aside from the inherently improbable nature of Kurokawa's ipse dixit statements, the *calendar of events* in the record of this case demonstrates Kurokawa never had the type of relationship she pleaded in her verified complaint or that she set forth in the claim filed in the probate court of Nevada. The record merely demonstrates that sometime prior to 1971, Kurokawa did have *a* relationship with Beaumont of two, or perhaps more years, which was terminated in 1971—the trial court so found in the summary judgment entered by it.

Thus, at bench, Mitchelson has asserted little, if any, evidence or legal support for any of Kurokawa's causes of action. The briefs state the record loosely, cite strained authorites, and discuss legal principles in a vacuum. Moreover, as already explained in our discussion of the complaint and the claim filed by Kurokawa in Beaumont's estate, the case is replete with inconsistent conclusions and/or evidentiary allegations, cradled in opportunism to circumvent Beaumont's clear defenses of no consummated contract, and/or the statute of limitations.

Mitchelson may have been troubled by the inherent weaknesses in Kurokawa's claims. However, whether he was or not, we feel the courts of this state and others have created a juristic ambiance of which many lawyers take advantage, and must share responsiblility for the flood of lawsuits launched on gossamer-thin evidentiary support and warped analysis of applicable legal theories.

We have for the reasons set out above limited sanctions to the sum of $15,000, payable solely by Marvin M. Mitchelson to respondent, and as required by Business and Professions Code section 6089, subdivision (b),[4] forward a copy of this opinion to the State Bar.

The judgment is affirmed. Respondent to recover costs on appeal.

In addition, Marvin M. Mitchelson, counsel for appellant, is directed to pay $15,000 to respondent as sanctions for prosecuting a frivolous appeal.

Compton, J., and Fukuto, J., concurred.

---

[4] Business and Professions Code section 6089 states, in pertinent part: "On and after July 1, 1987, a court shall notify the State Bar of all of the following:

". . . . . . . . . . . . . . .

"(b) The imposition of any judicial sanctions against the attorney, except sanctions for failure to make discovery or monetary sanctions of less than one thousand dollars ($1,000).

"The court shall also notify the attorney involved that the matter has been referred to the State Bar.

"The State Bar shall investigate any matter so reported as to the appropriateness of initiating disciplinary action against the attorney."

APPENDIX I

No. <u>87-1539</u>

Dept. No. _____

# In the Second Judicial District Court
## Of the State of Nevada, in and for the County of Washoe

| IN THE MATTER OF THE ESTATE OF | |
|---|---|
| ROBERT BEAUMONT | **GENERAL CLAIM** |
| Deceased. | |

Claim of <u>KO KO KUROKAWA</u> , <u>100 No. Clark Dr., #103, Los Angeles,</u>
NAME           ADDRESS    CA   90048

    The undersigned creditor of the above-named deceased presents this claim against the deceased, a statement of which is hereto annexed, marked "A".

| | $ | |
|---|---|---|
| SEE ATTACHED ATTACHMENT "A" | | |
| | | |
| | | |
| | | |
| | | |

STATE OF NEVADA
COUNTY OF WASHOE } ss.

    The undersigned, being duly sworn, says: that __she is the <u>above-named</u>
creditor named in and who makes the foregoing claim against the estate of <u>Robert Beaumont</u> , deceased, that the amount of said claim, to wit: the sum of <u>Twenty Million ($20,000,000.00)</u> Dollars, is justly due to said claimant; that no payments have been made thereon which are not credited, and there are no offsets to the same to the knowledge of this affiant; that affiant has personal knowledge of all the facts of said claim.

<u>Ko Ko Kurokawa</u>

Subscribed and sworn to before me this _____
day of _____ , 19 ___ .
<u>JUDI BAILEY</u>
CLERK OF THE COURT

by _____
DEPUTY CLERK

The within claim is _____ for $ _____ , this ___ day of _____ , 19 ___ .
(APPROVED) (DISAPPROVED)

_____
EXECUTOR OR ADMINISTRATOR

Allowed and approved for $ _____ this ___ day of _____ , 19 ___ .

_____
DISTRICT JUDGE

(NOTE: Mail copy to attorney for estate)

## ATTACHMENT "A"

Claimant, KOKO KUROKAWA, hereby makes claim against the personal representative of the estate of Robert Beaumont as follows:

Claimant and decedent did, for a period of 16 years, live together, in all respects, as husband and wife, and did enter into certain agreements with one another concerning one another's rights in the property of the other and rights to support, care and maintenance.

Claimant and decedent did agree that, in consideration of the assistance which Claimant provided in the building, developing and maintaining the decedent's business interests and in consideration of Claimant protecting decedent from various matters which would generate adverse publicity, decedent promised to finance Claimant's fashion business and assure its solvency.

Further, claimant and decedent did, for a period of 16 years, live together in all respects as husband and wife, holding themselves out as husband and wife, acquiring property in their joint names, sharing living expenses, combing [sic] assets and in all other respects did behave as husband and wife intending thereby to create and establish the same material rights and obligations which would have arisen between them had they in fact been formally married.

Further, that the circumstances giving rise to a right on claimant's behalf to one-half the property in the estate of the decedent and condition of the relationship which existed between claimant and decedent and the course of conduct which they established over a period of years gives rise to the presumption of an intent on their part to create the rights and obligations between themselves which normally exist between a formally married husband and wife giving rise to right on claimant's behalf to one-half of the property in the estate of the decedent.

Further, that during the period of their relationship, claimant did perform valuable services for decedent in his personal and business life and is entitled to compensation therefore in a sum equal to the reasonable value of such services.

Further, as a result of the work and effort of claimant, the value of decedent's estate has been greatly increased and said estate and the heirs thereof would be unjustly enriched unless claimant were to receive that portion of the estate attributed to her efforts.

Further, during the period of their relationship, it was orally agreed between decedent and claimant that certain properties held in the name of decedent were, in fact, jointly and equally owned by the decedent and claimant.

Finally, an appeal before the California Court of Appeal, Second Appellate District has been initiated by Claimant as a result of a ruling in favor of decedent on a Motion for Summary Judgment, the date of said judgment being entered on June 30, 1986. Claimant's Opening Brief in said Appeal is due on or before July 17, 1987.