[No. G015181. Fourth Dist., Div. Three. Nov. 30, 1994.]

In re the Marriage of MARILYN J. and TERRY L. SCHNABEL.
MARILYN J. SCHNABEL, Respondent, v.
TERRY L. SCHNABEL, Appellant.

**COUNSEL**

Roquemore, Pringle & Moore and John P. Pringle for Appellant.

James C. Booth for Respondent.

**OPINION**

**SONENSHINE, J.**—Terry L. Schnabel appeals pretrial attorney fees and support orders payable to Marilyn J. Schnabel.

I

If the names of the parties sound familiar, there is good reason. We have written several opinions and the Supreme Court has authored one—*Schnabel v. Superior Court* (1993) 5 Cal.4th 704 [21 Cal.Rptr.2d 200, 854 P.2d 1117]. Suffice it to say, this dissolution has gone on for a long time.[1]

In this chapter we consider whether the trial court abused its discretion in ordering Terry to pay Marilyn $10,000 in pretrial attorney fees and $1,650 in monthly spousal support. We conclude it did not.

II

In June 1991, shortly after the dissolution petition was filed, the parties stipulated to certain pendente lite support orders. Two years later,

---

[1] (1) G012033—our opinion filed September 1992; review granted by Supreme Court November 30, 1992; (2) *Schnabel v. Superior Court, supra,* 5 Cal.4th 704; (3) G013683—opinion filed March 1993; transferred back by Supreme Court in August 1993 for reconsideration in light of 5 Cal.4th 704; (4) G013683—*Schnabel v. Superior Court* (1993) 21 Cal.App.4th 548 [26 Cal.Rptr.2d 169]; (5) For a detailed history, see *Schnabel v. Superior Court, post,* page 758 [36 Cal.Rptr.2d 677].

discovery was completed pursuant to Supreme Court mandate. (*Schnabel* v. *Superior Court, supra,* 5 Cal.4th 704.) Marilyn filed the underlying order to show cause requesting an increase in spousal support and $23,000 in attorney fees.

The court found Marilyn's "CPA's report to be persuasive and [found Terry's] controllable cash flow to be at least $6850 per month."[2] Terry has several complaints about the report and contends the court erred in relying on it. And therefore the court erred in finding he had the ability to pay the spousal support and attorney fees as ordered.

Terry first attacks the inclusion of $2,747 for medical and life insurance premiums because he was obligated to maintain this coverage for Marilyn. But he failed to object below and therefore this issue cannot be raised on appeal. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1138 [275 Cal.Rptr. 797, 800 P.2d 1227].) Moreover, any reduction in Marilyn's needs benefits Terry.

Terry next maintains he should not have been charged for the corporation's payment of his attorney fees because a promissory note evidenced his responsibility to repay that amount. And he argues the court erred in considering 30 percent of the fees charged to and paid by the corporation because there was no showing the fees were incurred for anything but a corporate purpose. Moreover, because no portion of the retained earnings were available to Terry, there was no Family Code section 9270 showing that Terry had the ability to pay Marilyn $10,000 (or any amount) in fees. Finally, citing a 1904 and a 1941 case, Terry maintains as a 30 percent shareholder, he could not force the corporation to pay him a dividend.

But credibility, not corporate control, is the issue. The court found, based on the corporation's past and present financial records, that but for the dissolution proceedings, adequate money would have been available. Indeed,

---

[2]Marilyn's expert's report indicated:

| | |
|---|---|
| Salary per W-2 ($2,250 × 24) | $54,000 |
| Bonus | - 0 - |
| Mileage and insurance added to W-2 per accountant | $ 3,596 |
| SUBTOTAL | $57,596 |
| Personal expenses charged on company credit card | $ 3,738 |
| Medical and life insurance perks (12 × $228.92) | $ 2,747 |
| Attorney fees re motion to quash discovery per billings: Terry | $14,610 |
| 30 percent of corporate billing | $ 3,273 |
| TOTAL ORANGE CONTAINER, INC. | $81,964 |
| Estimate of interest income | $ 200 |
| Annual controllable cash flow | $82,164 |
| Average monthly controllable cash flow | $ 6,847 |

all of Terry's arguments fail for the same reason. The court did not believe Terry or his witnesses.

This trial court said as much: "The court looks to certain issues as credibility issues. One, the validity of a promissory note dated in the very recent past for the amounts paid quite a bit earlier. [¶] The court also notes a substantial retained earnings of the corporation, and views that also as a credibility issue. These retained earnings have increased. The court notes the cash maintained by this corporation. This money is available. Granted, the court notes the 30 percent interest by the respondent. But he certainly does have an interest in that very cash in a retained earning sound corporation."

A review of the record indicates the following evidence was before the court.

(1)  The community owns 30 percent of the stock of Terry's employer, Orange Container, Inc.

(2)  The other 70 percent is owned by Harold Bankhard.

(3)  Terry has been vice-president of the corporation since its inception 11 years ago.

(4)  The corporation paid $28,800 for attorney fees billed to it and $21,821 for services rendered to Terry for fees relating to the dissolution.

(5)  Terry's fees predate any appellate process in which Marilyn requested the corporation's joinder.

(6)  Terry's personal credit card expense is reimbursed by the corporation, and he refuses to provide an accounting.

(7)  The corporation provides transportation, auto expenses, life insurance and medical insurance to Terry.

(8)  Bankhead has never refused to pay Terry's attorney fees through the corporation.

(9)  Terry's $21,115 promissory note to the corporation was signed three days before the original hearing date on the underlying order to show cause.

(10)  Marilyn's accountant, William Mills, testified he received a $3,500 retainer in 1991. Only a $500 credit remained. Substantial additional costs are required.

(11)   The income for 1989, 1990, and 1991 reported by Terry was greater than he was currently receiving.

(12)   The corporation's retained earnings from 1991 to 1992 increased by $131,666.

(13)   Retained earnings were available for bonuses that typically had been paid but were not since the parties' separation. Terry's and the corporation's accountant, Dale Herman, testified Terry received annual bonuses of $10,000 for 1989 and 1990, but none after the proceedings were commenced in 1991.

" '[O]ur power begins and ends with a determination as to whether there is *any* substantial evidence to support [the findings]. . . . we have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom.' [Citations.]" (*Leff* v. *Gunter* (1983) 33 Cal.3d 508, 518 [189 Cal.Rptr. 377, 658 P.2d 740].)

The trial court was well within its discretion in finding Terry possessed the ability to pay the attorney fees ordered and that Marilyn needed the money. As the court stated, "With regard to attorney fees: the court notes the amount of attorney fees here. They are substantial. And the court notes that this matter, from a discovery standpoint, has been up and down to the Supreme Court. And presently there's been about $80,000 in combined attorney fees, and there's 19,000 receivable now by petitioner's attorney. [¶] Fortunately, for the respondent there is no receivable that his attorney fees are being paid. And the court notes that the petitioner does have some cash-on-hand. But this 19,000 in attorney fees, given the history of this case, is going to increase significantly between now and the time of trial. And even if she does use her own money, I don't think it's the policy of the state that she become destitute paying her attorney fees. [¶] The court believes, again, there's substantial retained earnings, and there's certainly an ability to pay or have reasonable access to funds to pay. And I don't think it's fair that the respondent has his attorney fees paid through a community asset and the petitioner does not."

We agree. We do note, however, that despite overwhelming evidence of Terry's ability to pay and Marilyn's needs, the court nevertheless made the attorney fee award "without prejudice to further allocation at the time of trial." Marilyn gets her money now but at trial Terry can argue it should be a charge against her or the community.

Terry fares no better with his attack on the pendente lite spousal support order. He asks us to ignore the trial court's findings and accept his version.[3] He misunderstands the litigation process. Marilyn's expert gave his opinion of Terry's controllable cash flow based on his review of Orange Container's financial records. Terry's attorney cross-examined him and put on his own expert, who was also cross-examined. The court weighed this evidence, however, and came to its own conclusion. Terry lost.

## III

Marilyn asks the matter be remanded for assessment of attorney fees and costs against Terry. We do so and remind the trial court Family Code section 2030 intends Marilyn be paid "the amount reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding." To do otherwise would deny her "access to legal representation [necessary] to preserve all of [her] rights . . . ." (Fam. Code, § 2030.)[4]

## IV

On our own motion, we advised Terry and his counsel we would consider ordering Code of Civil Procedure section 907 sanctions payable by them to this court for a frivolous appeal.

*Computer Prepared Accounts, Inc.* v. *Katz* (1991) 235 Cal.App.3d 428 [286 Cal.Rptr. 556] is instructive: "Courts have struggled to apply Code of Civil Procedure section 907. [Citation.] On the one hand, the statute should be used to compensate for a party's egregious behavior, and to deter abuse of the court system and the appellate process. [Citations.] On the other hand, sanctions should not be awarded simply because an appeal is without merit. Indiscriminate application of section 907 could deter attorneys from vigorously representing their clients, and deter parties from pursuing legitimate appeals. [Citation.] [¶] *In re Marriage of Flaherty* [(1982)] 31 Cal.3d 637 [183 Cal.Rptr. 508, 646 P.2d 179] attempted to strike a balance between

---

[3]Terry's opening brief states: "This Court should reverse the order of September 20, 1993, and have the trial Court reset support based on the actual earnings of the parties, $4,800.00 for [Terry] and $1,700.00 for [Marilyn]. Using the Dissomaster, the award will be approximately one-half of what was ordered herein. It should be pointed out that the net income of [Terry] at the time the order was made herein was the sum of $3,431.00. . . . The order that was made here is basically one-half of his net income. Before payment of support [Marilyn's] net income was $1,227.00. . . . After payment of the support her net income jumps to $2,877.00. [Terry's] net income falls to $1,781.00."

[4]Based on this record, we also suggest Marilyn seek Family Code section 271 attorney fees.

preventing inexcusable conduct and preserving an attorney's ability to vigorously represent his or her client. The court set forth a test for determining whether an appeal is frivolous. Two standards, subjective and objective, were described. Under a subjective standard, the court assesses the motives of the party and the party's attorney. . . . Thus, a court should consider a party's good faith in determining the propriety of awarding sanctions. [¶] An objective standard, by contrast, 'looks at the merits of the appeal from a reasonable person's perspective.' [Citation.] A court should consider whether any reasonable person would conclude that the appeal is 'totally and completely without merit.' [Citations.] A judgment appealed 'despite the fact that no reasonable attorney could have thought [the appeal] meritorious ties up judicial resources and diverts attention from the already burdensome volume of work at the appellate courts.' [Citation.] [¶] In sum, *Flaherty* concluded that 'an appeal should be held to be frivolous only when it is prosecuted for an improper motive—to harass the respondent or delay the effect of an adverse judgment—or when it indisputably has no merit—when any reasonable attorney would agree that the appeal is totally and completely without merit.' [Citation.]" (*Computer Prepared Accounts, Inc. v. Katz, supra,* 235 Cal.App.3d at pp. 434-435, fn. omitted.)

By either of the above standards, this appeal is frivolous. Terry appeals a pretrial spousal support order which increases his obligation about $150 a month from an amount to which he had previously stipulated. No matter how far in the future the trial date might be set, under these circumstances this increase does not warrant the expenditure necessary to prosecute this appeal. His second issue addresses the attorney fee order. Terry rehashes evidentiary findings and cites "little, if any, . . . legal support for any of [his arguments]. The briefs . . . discuss legal principles in a vacuum" and rely on outdated and inapt authority. (*Kurokawa v. Blum* (1988) 199 Cal.App.3d 976, 996 [245 Cal.Rptr. 463].) Given the past history of this matter and a review of the record before us, we can only conclude that the appeal is totally devoid of merit and was brought merely to harass and delay. (*In re Marriage of Economou* (1990) 223 Cal.App.3d 97, 105-106 [272 Cal.Rptr. 673].)[5] We conclude it was only filed because Terry and Orange still refuse to accept the fact that in dealing with Marilyn they must play by the rules of law and not their own.

---

[5]In the context presented here, this is a particularly egregious ploy. "Women . . . face greater financial obstacles than men in gaining access to the courts because they lack funds to retain appropriate legal and expert counsel. The Nevada task force reported that a divorcing woman must 'beg [the court], piecemeal, for a few dollars which she must prove is "needed" to prosecute her action or defense' whereas 'the husband spend[s] freely from community funds for his own legal needs' . . . ." (See Schafran, *Gender Bias in Family Courts* (Aug. 1994) 17 Family Advocate, No. 1, p. 26.)

There are other consequences to the filing of this frivolous appeal beyond the harm suffered by Marilyn. "Other appellate parties, many of whom wait years for a resolution of bona fide disputes, are prejudiced by the useless diversion of this court's attention. (Martineau, *Frivolous Appeals: The Uncertain Federal Response* (1984) Duke L.J. 845, 848 & fn. 18.) In the same vein, the appellate system and the taxpayers of this state are damaged by what amounts to a waste of this court's time and resources. (See generally, *Bennett* v. *Unger* (1969) 272 Cal.App.2d 202, 211 [77 Cal.Rptr. 326]; cf. Cann, *Frivolous Lawsuits—The Lawyer's Duty to Say 'No'* (1981) 52 U.Colo. L.Rev. 367, 368-369 [discussing the social cost of frivolous appeals].) Accordingly, an appropriate measure of sanctions should . . . compensate the government for its expense in processing, reviewing and deciding a frivolous appeal. (*Bennett* v. *Unger, supra,* 272 Cal.App.2d at p. 211; Eisenberg, [*Sanctions on Appeal: A Survey and a Proposal for Computation Guidelines* (1985)] 20 U.S.F. L.Rev. at p. 33.)" (*Finnie* v. *Town of Tiburon* (1988) 199 Cal.App.3d 1, 17-18 [244 Cal.Rptr. 581].)

Several courts have addressed the appropriate amount of sanctions when they are to be paid to the appellate court clerk. (See Eisenberg et al., Cal. Practice Guide: Civil Appeals & Writs (The Rutter Group 1994) ¶ 11:142, p. 11-32.5, citing "*Cohen* v. *General Motors Corp.* (1992) 2 [Cal.App.4th] 893, 897 . . . (finding $5,908.26 to be cost of average civil appeal [using latest cost figures,] but assessing sanctions payable to clerk at 75% of that amount because appeal only *became* frivolous *after* rendition of appellate decision in related case); *People* ex rel. *Dept. of Transp.* v. *Outdoor Media Group* [(1993) 13 Cal.App.4th 1067 (17 Cal.Rptr.2d 19)] ($5,908.26); *Young* v. *Rosenthal* [(1989) 212 Cal.App.3d 96 (260 Cal.Rptr. 369)] (estimating $3,995 as cost of average appeal but $25,000 as cost of this particularly complex appeal); *City of Bell Gardens* v. *County of Los Angeles* (1991) 231 [Cal.App.3d] 1563, 1574 . . . (same); *Marriage of Economou* ('*Economou II*'), *supra,* 223 [Cal.App.3d] at 107-108, . . . ($15,000 as 'proper total cost to the State assignable to this case'); *Bank of California* v. *Varakin* [(1990)] 216 [Cal.App.3d 1630,] 1640 . . . ($25,000).") Based on the above cited cases and a review of this record, we direct that $2,500 is payable immediately to the clerk of this court.

We now determine who is responsible for the sanctions. Sanctions may be ordered against a litigant (*Town of Woodside* v. *Gava* (1989) 213 Cal.App.3d 488, 496 [261 Cal.Rptr. 730]) and/or against the lawyer (*M. E. Gray Co.* v. *Gray* (1985) 163 Cal.App.3d 1025 [210 Cal.Rptr. 285]). We find the conduct of both Terry and his lawyer John P. Pringle to merit sanctions.

Business and Professions Code section 6068, subdivision (c) states, in pertinent part, it is an attorney's duty "[t]o counsel or maintain such actions, proceedings, or defenses only as appear to him or her legal or just . . . ." Indeed, sanctions may be assessed solely against a lawyer who, because the appeal was so totally lacking in merit, had a professional obligation not to pursue it and perhaps should have declined the case outright. (*Kurokawa* v. *Blum, supra,* 199 Cal.App.3d 976, 996; see also *Cosenza* v. *Kramer* (1984) 152 Cal.App.3d 1100 [200 Cal.Rptr. 18] [attorney alone sanctioned when evidence established "as a matter of law" that appeal was totally without merit].)

Terry cannot, however, put all of the blame on his counsel. He initiated the appeal and pursued it. And the record amply supports a finding he benefited from the delay. (*Summers* v. *City of Cathedral City* (1990) 225 Cal.App.3d 1047, 1080 [275 Cal.Rptr. 594].) As conceded at oral argument, Marilyn's attorney fees have still not been paid.[6]

The orders in favor of Marilyn are affirmed. The amount of attorney fees Terry is to pay to Marilyn is remanded to the trial court for determination. (Fam. Code, § 2030.) Terry is ordered to pay the clerk of this court $1,250 as further sanction for pursuing a frivolous appeal. John Pringle is ordered to pay the clerk of this court $1,250 as sanctions for pursuing a frivolous appeal.[7]

Sills, P. J., concurred.

**WALLIN, J.,** Concurring and Dissenting.—I agree that sanctions are appropriate in this case. If Marilyn Schnabel had sought sanctions from Terry Schnabel I would have awarded them. However, I disagree with the idea that the sanctions should be payable to this court. Due process entails adjudication by a neutral decisionmaker who, by definition, does not benefit from the decision. Obviously the court benefits at least incrementally from the determination that sanctions are warranted. That does not seem very neutral to me. Since we are the appellate court, there is also no right of appeal. How is this for due process: we announce to the parties that we are thinking that

---

[6]This opinion constitutes the written statement of reasons required by *In re Marriage of Flaherty* (1982) 31 Cal.3d 637 [183 Cal.Rptr. 508, 646 P.2d 179]. *Flaherty*'s other requirements have also been met. We gave notice of the hearing and provided an opportunity to respond in writing and at the hearing.

[7]Business and Professions Code section 6068, subdivision (o)(3) provides it is the duty of an attorney to report to the agency charged with attorney discipline, in writing, within 30 days of the time the attorney has knowledge of the imposition of any judicial sanctions of more than $1,000 against the attorney.

sanctions are appropriate, and then, after we decide they are, award them to ourselves! While I realize that plenty of opinions impliedly countenance the payment of sanctions to a court, I do not believe our Supreme Court has ever squarely confronted the issue. It may wish to do so sometime in the future.

Appellant's petition for review by the Supreme Court was denied February 23, 1995.