Filed 6/4/19; Modified and certified for partial publication 7/1/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| J.B.B. INVESTMENT PARTNERS LTD. et al., | |
| Plaintiffs and Respondents, | A152877 & A153698 |
| v. | |
| R. THOMAS FAIR et al., | (San Mateo County Super. Ct. No. CIV522693) |
| Defendants and Appellants. | |

In the first appeal in this consolidated matter[1] (case No. A152877), R. Thomas Fair (Fair), Bronco RE Corporation (Bronco), BRE Boulevard LLC (Boulevard), and BRE Cameron Creek LLC (Cameron; collectively defendants) appeal after the trial granted in part of the motion for summary adjudication filed by J.B.B. Investment Partners, Ltd. (JBB) and Silvester Rabic (Rabic; collectively plaintiffs), arising from defendants' alleged breach of a settlement agreement between the parties. On appeal, defendants contend the court erred in granting the motion because triable issues of material fact exist regarding whether the parties ever entered into a binding settlement agreement.

In the second appeal (case No. A153698), plaintiffs appeal after the trial court denied most of the attorney fees they requested in their motion for attorney fees in this matter. Plaintiffs contend the trial court should have awarded them attorney fees for the

---

[1] On April 25, 2018, we granted defendants' unopposed motion to consolidate the two appeals.

1

entire dispute, consistent with Civil Code section 1717's mutuality requirement and public policy or, at a minimum, it should have awarded them fees as prevailing parties on defendants' failed motions to compel arbitration and a related appeal.

We shall affirm the judgment in case No. A152877, and shall also impose monetary sanctions on defendants and their attorneys for bringing a frivolous appeal. We will also affirm the order in case No. A153698.

## BACKGROUND[2]

Fair, an attorney and inactive member of the California State Bar, is the founder of Bronco, and Bronco is the managing member of Boulevard and Cameron. Boulevard and Cameron are Arizona limited liability companies (LLCs) formed in 2007, and they each own apartment units in Arizona.

JBB is a limited partnership based in Atherton, California and Rabic is a nonattorney individual investor. In late 2007 and early 2008, JBB invested $150,000 and Rabic invested $100,000 in Boulevard and Cameron, and both became members of the LLCs.

Subsequently, plaintiffs asserted they had discovered that defendants had made various fraudulent representations and omissions, and the parties attempted to negotiate a settlement of their dispute. On July 4, 2013, Jack Russo, plaintiffs' counsel, sent a demand letter to Fair via email, in which a final settlement offer was made (July 4 offer). On July 5, after receiving no response from Fair, plaintiffs filed a lawsuit against defendants. Later that same day, Fair responded to Russo's demand letter by email, stating that he agreed to settle the matter. Fair repeated his acceptance of the July 4 offer several times in emails and voice messages to Russo and Ansel J. Halliburton, another of plaintiffs' attorneys.

---

[2] The factual and procedural background is taken in part from our prior opinions in this case, *J.B.B. Investment Partners, Ltd. v. Fair* (2014) 232 Cal.App.4th 974, 978 (*J.B.B. Investment Partners I*) and *J.B.B. Investment Partners, Ltd. v. Fair* (A145221, Jan. 25, 2017) [nonpub opn.] (*J.B.B. Investment Partners II*).

2

On July 11, 2013, Halliburton sent a draft of the final settlement. On August 6, after subsequent communications between the parties and after Fair failed to sign the July 11 settlement agreement, plaintiffs filed a motion pursuant to Code of Civil Procedure section 664.6[3] to enforce the parties' settlement, which plaintiffs argued they had entered into through the July 4 and 5 email exchanges between Fair and counsel for plaintiffs. On August 15, defendants filed a motion to stay the action and compel arbitration, pursuant to the arbitration provision contained in each LLC's operating agreement.

On October 18, 2013, following a hearing, the trial court granted plaintiffs' motion to enforce the settlement and denied defendants' motion to compel arbitration. On November 1, the court entered its judgment granting plaintiffs' motion to enforce the settlement. Also on November 1, the court entered a separate order denying defendants' motion to stay the action and compel arbitration.[4]

On November 12, 2013, defendants filed a notice of appeal solely from the trial court's November 1 "Order on Motion to Enforce Settlement and Judgment Pursuant to [section 664.6]." On December 5, 2014, a panel of this Division found that "Fair's printed name on the document sought to be enforced as a settlement was not a signature," for purposes of section 664.6's signature requirement. We therefore reversed the judgment enforcing the settlement. (*J.B.B. Investment Partners I*, *supra*, 232 Cal.App.4th at p. 978.)[5]

---

[3] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

[4] The court certified both its judgment enforcing the settlement and its order denying arbitration for interlocutory appeal under section 166.1.

[5] In light of this holding, we "express[ed] no opinion as to whether plaintiffs can enforce the[ir] July 4 offer [to settle] by another method, such as a motion for summary judgment for breach of contract." (*J.B.B. Investment Partners I*, *supra*, 232 Cal.App.4th at p. 991, fn. 4.) In the opinion, we also affirmed the trial court's postjudgment order denying plaintiffs' motion for attorney fees because they were no longer the prevailing party and therefore not entitled to fees. (*Id.* at pp. 977–978, 983.)

On April 20, 2015, plaintiffs filed a first amended complaint, alleging causes of action for securities fraud in violation of the California Corporations Code, fraud, breach of fiduciary duty, constructive fraud, breach of contract, breach of the implied covenant of good faith and fair dealing, declaratory relief, promissory estoppel, rescission for fraud in the inducement, and legal malpractice. They also filed a motion for summary judgment. Also on April 20, defendants filed a second motion to stay the action and compel arbitration, based on the same arbitration provisions in the applicable operating agreements they relied on in the first motion to compel arbitration.

On May 15, 2015, following a hearing, the trial court denied defendants' motion to stay the action and compel arbitration, on the grounds that (1) the motion was "an untimely and improper request for reconsideration" of the prior order denying defendants' motion to compel arbitration, and (2) defendants had "engaged in extensive litigation activities which indicate a waiver of their right to arbitrate claims arising out of the alleged Operating Agreements."

Defendants appealed and on January 25, 2017, a panel of this Division affirmed the trial court's order denying the motion to compel arbitration. (*J.B.B. Investment Partners II*, *supra*, A145221.)

On April 12, 2017, defendants filed a cross-complaint, alleging causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, violation of Business and Professions Code section 17200, breach of fiduciary duty, negligent and intentional infliction of emotional distress, and false imprisonment.

On May 12, 2017, plaintiffs filed a special motion to strike (anti-SLAPP motion), pursuant to section 425.16, directed to defendants' cross-complaint. On July 21, the trial court granted the motion in its entirety. The court also awarded plaintiffs $12,609 in attorney fees and costs, pursuant to section 425.16, subdivision (c)(1). Following defendants' appeal, we affirmed the trial court's order granting plaintiffs' anti-SLAPP motion. (*J.B.B. Investment Partners, Ltd. v. Fair* (A152143, Feb. 5, 2019) [nonpub. opn.] (*J.B.B. Investment Partners III*).)

4

On August 9, 2017, plaintiffs filed two motions for summary adjudication related to the July 5, 2013 agreement: first, as to the eighth cause of action for breach of contract or, in the alternative, the ninth cause of action for promissory estoppel, and second, for release of claims as to causes of action 1-7, 10, and 11.

On October 27, 2017, the trial court granted plaintiffs' motion for summary adjudication as to the eighth cause of action in their first amended complaint for breach of contract and denied the motion as to the ninth cause of action for promissory estoppel. As to the breach of contract cause of action, the court found as a matter of law that "on July 5, 2013, [Fair], on behalf of himself and the three entity defendants, entered into a binding settlement agreement with plaintiffs. Defendants thereafter breached the agreement by refusing to recognize and comply with the terms of the settlement. Because the court finds no triable issues on plaintiffs' breach of contract claim, including the amount of damages ($350,000 plus interest from July 1, 2014), the claim is amenable to summary adjudication. [Citation.]" As to the alternative promissory estoppel cause of action, the court found that because it was not reasonably disputable that there was adequate consideration to support the agreement, promissory estoppel did not apply.

In addition, the court found that because plaintiffs' July 4 offer expressly contemplated a general release and waiver of claims upon defendants' payment of the proposed settlement funds, the granting of plaintiffs' motion for summary adjudication of the eighth cause of action "extinguishes causes of action 1-7, 10 and 11. By virtue of the settlement, plaintiffs have released their claims against defendants." The court therefore granted plaintiffs' second summary adjudication motion regarding release of claims.[6]

On November 7, 2017, defendants filed a notice of appeal from the court's order granting summary adjudication of the eighth cause of action in plaintiffs' first amended complaint.

On January 29, 2018, the court entered a final judgment in plaintiffs' favor.

---

[6] On November 13, 2017, plaintiffs dismissed the ninth—and last remaining—cause of action.

5

On November 15, 2017, plaintiffs filed a motion for attorney fees, as the prevailing party in the action, requesting $621,328.34 in fees and costs.

On January 29, 2018, the trial court awarded plaintiffs $4,918.00 in attorney fees "for the additional SLAPP related proceedings," but denied the additional requests for fees incurred in litigating their initial and first amended complaints; defending against defendants' cross-complaint, in which they had already been awarded $12,609 in fees and costs; opposing defendants' motion for a stay pending appeal following the order granting the anti-SLAPP motion; and opposing defendants' motions to compel arbitration and defending against defendants' prior appeal from the court's order denying the final motion to compel arbitration.

On February 14, 2018, plaintiffs filed a notice of appeal from the court's order denying their motion for attorney fees.

## DISCUSSION

### I. *Defendants' Appeal of the Grant of Plaintiffs' Motion for Summary Adjudication as to the Breach of Contract Cause of Action*

#### A. *The Merits*

In case No. A152877, defendants contend the court erred in granting plaintiffs' motion for summary adjudication as to the eighth cause of action for breach of contract because triable issues of material fact exist regarding whether the parties ever entered into a binding settlement agreement.

"A party may move for summary adjudication as to one or more causes of action within an action . . . if the party contends that the cause of action has no merit . . . . A motion for summary adjudication shall be granted only if it completely disposes of a cause of action . . . ." (§ 437c, subd. (f)(1).) A motion for summary adjudication "shall proceed in all procedural respects as a motion for summary judgment." (§ 437c, subd. (f)(2).)

"For purposes of motions for summary judgment and summary adjudication: [¶] A plaintiff or cross-complainant has met his or her burden of showing that there is no defense to a cause of action if that party has proved each element of the cause of action

6

entitling the party to judgment on the cause of action. Once the plaintiff or cross-complainant has met that burden, the burden shifts to the defendant or cross-defendant to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto. The defendant or cross-defendant shall not rely upon the allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to the cause of action or a defense thereto." (§ 437c, subd. (p)(1); see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849.)

" ' "[W]e take the facts from the record that was before the trial court when it ruled on that motion," ' and ' " ' "review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained." ' " ' [Citations.] In addition, we ' "liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." ' [Citations.]" (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1039.)

" 'A settlement agreement is a contract, and the legal principles [that] apply to contracts generally apply to settlement contracts.' [Citation.] Its validity is thus 'judged by the same legal principles applicable to contracts generally.' [Citations.]" (*Stewart v. Preston Pipeline Inc.* (2005) 134 Cal.App.4th 1565, 1585 (*Stewart*).) The elements of a cause of action for breach of contract include the existence of a contract, plaintiff's performance or excuse for non-performance, defendants' breach, and resulting damages to plaintiff. (*CDF Firefighters v. Maldonado* (2008) 158 Cal.App.4th 1226, 1239.) The first element—the existence of a contract—requires parties capable of contracting, their consent, a lawful object, and a sufficient cause or consideration. (Civ. Code, § 1550.)

In the present case, defendants claim no contract came into existence because the mutual consent requirement was not satisfied, arguing that there is a triable issue of fact as to whether their purported acceptance of the July 4 offer was "absolute and unqualified" as is required before a court will find consent. (Civ. Code, § 1585.)

7

The undisputed evidence in the record shows the following. Russo, plaintiffs' attorney, sent the July 4 offer to Fair via email on the evening of July 4, 2013, stating that it was plaintiffs' "LAST AND FINAL OFFER," and setting forth the 10 required terms of the settlement. The final paragraph of the offer stated, "WE require a YES or NO on this proposal, you need to say 'I accept' and I will work the balance of this holiday weekend to get the paperwork drafted. Anything less shifts all focus to the litigation and to the court Orders we will seek now as well as in the future as well as the subpoenas we will serve on Folio and a hosts [*sic*]. It is now up to you to decide whether you would rather resolve this amicably or not. Let me know your decision."[7]

---

[7] The July 4 offer further stated in relevant part: "NO interest in your counter-offer for settlement, Tom, too little, too late, and I think the train has left (and certainly is leaving) the station. They are NOW more than ever convinced that you defrauded them, that you defrauded others, and that you have to be exposed for the Ponzi schemes you run. I say that because you have gone from one failure (Boulevard) to another (Cameron) to yet another fund-raising (Folio) and they are NOW convinced that your refusal to turn over all documents of ALL transactions is [be]cause you moved monies ILLEGALLY from Boulevard to support Cameron and now to get Folio started[.] YOUR CAREER IS ON THE LINE HERE, YOU MAY OR MAY NOT SEE IT THIS WAY BUT IN MY 33+ YEARS OF PRACTICE I HAVE SEEN FOLKS TALK THEIR WAY OUT OF ONE LAWSUIT BY ONE CLAIMANT, EVEN OUT OF TWO LAWSUITS BY TWO CLAIMANTS, BUT WE ARE TALKING NOW (SOON) THREE OR MORE LAWSUITS BY THREE OR MORE ADDITIONAL CLAIMANTS SO THIS IS THEIR LAST AND FINAL OFFER BEFORE ORDERS ARE OBTAINED FROM THE COURT THIS WEEK[.]

"1. You must represent and warrant (and provide full disclosure that) no monies moved illegally from one entity to another, they still do not understand how much money you pulled out of Boulevard or why that investment entirely failed (and full disclosure means turn over 100% of everything) and if this is a non-starter, it will confirm for them the Ponzi Scheme they NOW believe exists here and has existed for perhaps as long as Bernie Madoff got away with it. But that was discovered and eventually they all are so the day of reckoning is really at hand and if you feel 100% innocent you should disclose and disclose fully (and should have months ago).

"2. You must enter a Stipulated Judgment for $350,000 which is the full bore amount of all amounts invested, all interest, all fees, all costs and everything else which Stipulated Judgment will be held in escrow and not entered if payment is timely made in accord with the next paragraph."

The next day, July 5, at 10:17 a.m., Fair responded, "Jack, the facts will not in any way support the theory in your email. I believe in Cameron. So I agree. Tom [F]air."

At 10:28 a.m., Halliburton, another attorney for plaintiffs, sent an email to Fair stating, "I don't understand your email. Are you rejecting Jack's settlement offer or accepting it? Please be unambiguous, because I am about to file the complaint and ex parte papers unless we hear an unambiguous acceptance." At 11:20 a.m., Halliburton sent another email to Fair stating that he was at the courthouse and had left Fair two voicemail messages and telling Fair to call him if he wanted to accept the offer. At 11:29 a.m., Russo sent Fair an email stating that counsel were at the courthouse and preparing

The offer continued with several more terms of the agreement, including timing and conditions for staying all litigation pending Fair's payments and the filing of general releases and a waiver of claims.

The offer then stated: "9. All other forebearances [*sic*] set forth in the previous email to you including mutual non-disparagements, mutual confidentiality and the like will be part of the standard settlement paperwork, they will agree not to contact or otherwise respond to other claimants who inquire about the situation or about the Schuster Litigation or otherwise. ALL bets are off in this regard if you let this last settlement opportunity pass today.

"10. The Settlement Paperwork would be drafted in parallel with your full disclosure of all documents and all information as required by the first paragraph hereof; it is a material inducement to this settlement that you demonstrate that there is, IN FACT, not a Ponzi or Ponzi-like scheme at work here and the misrepresentations and non-disclosures of which they have complained are, in fact, simply at most a negligent mistake on your part—as was the failure to get signatures on the ACTUAL FULL-LENGTH LLC Operating Agreements AND at that time, you disclosed that 'priority' really has NO MEANING in the context of the 'priority payments' which they were promised.]

"At bottom, they would rather have a jury determine that representing 'priority payments' would be made when NONE were paid is just outright fraudulent. . . . Trust me, in this environment with the Bernie Madoffs of the world behind bars it is not hard for jurors to REQUIRE that over-disclosure occur and anything less is not just fiduciary breach but rather fraud and the type of fraud that cannot be discharged in bankruptcy. That is not really an option here so you should think carefully about whether you want to test your career in front of 12 honest, hard-working San Mateo citizens. It is your choice; this is their last offer. . . ."

9

to file the action, and that Fair needed to respond, "I accept." At 12:25 p.m., Halliburton sent an email to Fair informing him that plaintiffs had filed their complaint in San Mateo County Superior Court.

At 1:02 p.m., Fair responded, "I said I agree. Took wording right from Jack's email. I agree." At 1:04 p.m., Fair left a voicemail for Halliburton, stating that he had not been able to respond earlier because he had been playing golf on a course that did not allow cell phones and that "I agreed to your terms . . . I agreed. We have a deal . . . you can stop proceeding at this point. . . ." At 1:07 p.m., Fair sent an email to Halliburton in which he stated, "I do not believe you gave proper notice. Also I agreed with your terms. You should [n]ot have filed. We clearly have an agreement. tom fair [*sic*]." At 1:36, Fair sent an email to Russo, stating, "Filing does not obviate agreement/acceptance. Pls [please] acknowledge."

At 1:53 p.m., in an email to Fair, Russo stated, "This confirms full agreement, I will work on the formal settlement paperwork which will conform to the settlement agreement made today based on the 10 numbered paragraphs. . . . I will seek to get that settlement paperwork to you for review by Monday with the goal of getting it all finalized and signed next week. The settlement is otherwise binding under [section 664.6]." At 1:55 p.m., Fair sent a text message to plaintiffs' counsel, stating "I have accepted by phone and emai[l]. I said accepts which is the same as 'agreed.' You must stop and you must tell the court we have an agreement." At 2:09 p.m., Fair's emailed response to Russo's 1:53 p.m. email confirming full agreement was "Ok."

We agree with the trial court's conclusion that "[t]he foregoing communications permit only one reasonable conclusion—the parties agreed to a binding settlement on July 5, 2013." The plain language of these communications demonstrates, as a matter of law, the existence of a settlement agreement between the parties. (See *Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 811 [" 'The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe' "].) We therefore find meritless defendants' claim that Fair's "July 5 e-mail was a further

10

expression of [his] hope that the parties could reach a final agreement." (See *Harris v. Rudin, Richman & Appel* (1999) 74 Cal.App.4th 299, 307 (*Harris*) [" 'The objective intent as evidenced by the words of the instrument, not the parties' subjective intent, governs our interpretation' "].)[8]

Moreover, the fact that plaintiffs planned to follow up with a formal written agreement, which they did on July 11, 2013, does not render the earlier agreement invalid, given the parties' communications on July 4 and 5, which demonstrated their intent to be bound by the terms of the July 4 offer. (See *Blix Street Records, Inc. v. Cassidy* (2010) 191 Cal.App.4th 39, 48 ["When parties intend that an agreement be binding, the fact that a more formal agreement must be prepared and executed does not alter the validity of the agreement"].) Defendants are correct that the July 11 written agreement contained additional terms not contained in the July 4 offer, including a term that no defendant admits liability, an indemnification agreement, a waiver of unknown claims, a governing law provision, and an integration clause. The July 11 agreement also contained a definition of the parties subject to the proposed agreement and signature blocks for each defendant. These additions, however, were standard settlement terms that did not materially change the specific terms of the July 4 offer that was accepted on July

---

[8] Defendants point to Fair's declaration and deposition testimony as showing that he did not believe he had agreed to a final settlement. For example, in his declaration, Fair stated, "When I sent my response to Mr. Russo's July 4, 2103 e-mail, I did not consider it a formal acceptance of any final and complete settlement offer. Rather, I considered my response . . . to be in the nature of an agreement to work towards a formal agreement, much like a binding letter of intent." In his deposition testimony, Fair further stated that when he said he agreed, "I was agreeing to work it out," to avoid litigation, not agreeing that the July 4 offer was a final agreement. He also stated that "I thought I had agreed to terms that were suggested in an e-mail during the morning, which had become moot . . . ." He believed that the proposal had become moot "[b]ecause they did file [the complaint], and I changed my mind."

Fair's belated assertion that he did not intend to be bound when he said he accepted the July 4 offer is belied by an objective reading of the words he used in his emails to plaintiffs' counsel, in which he repeatedly said he agreed to the proposal and insisted the parties had an agreement. (See *Harris*, *supra*, 74 Cal.App.4th at p. 307.)

11

5. (See *ibid.*; compare *Weddington Productions, Inc. v. Flick*, *supra*, 60 Cal.App.4th at pp. 813–814 [because a not yet drafted licensing agreement was "centrally material" to settlement agreement and there had been no meeting of minds on its terms, agreement was unenforceable].) In addition, the fact that defendants failed to sign the July 11 agreement does not nullify the binding nature of the July 5 settlement. (See *Harris*, *supra*, 74 Cal.App.4th at p. 307 ["Where the writing at issue shows 'no more than an intent to further reduce the informal writing to a more formal one' the failure to follow it with a more formal writing does not negate the existence of the prior contract"].)[9]

In their briefing, defendants erroneously claim that in our 2014 opinion, in which we held that the settlement agreement was not enforceable under section 664.6 because Fair's typed name in a July 5, 2013 email, did not constitute an electronic signature, we "determined" that Fair's responses to the July 4 offer "did not create a binding settlement agreement because the 'plain language of the July 4 offer made it clear that . . . future paperwork was forthcoming.' (*J.B.B. Investment Partners [I]*, *supra*, 232 Cal.App.4th at p. 989.)" Defendants' partial quotation from our 2014 opinion is misleading. We were not addressing whether Fair's responses to the July 4 offer created a binding settlement agreement, but instead were addressing the fact that "the plain language of the July 4 offer made it clear that *no signature was being requested as the offer included no signature line or signature block, contained no signature by any of the plaintiffs, and advised that future paperwork was forthcoming.*" (*J.B.B. Investment Partners I*, at p. 989, italics added.) This language does not reflect any conclusion on our part as to the

---

[9] Equally unconvincing is defendants' argument that plaintiffs are estopped by their own admissions from claiming the parties entered into an enforceable settlement agreement on July 5, 2013. They quote from a July 16 email in which plaintiffs' counsel stated, "Once we have your [signature] . . . we can be done" and a July 19 email in which counsel stated, "we must close the final settlement paperwork . . . . We are not going to stay anything until we have a signed deal." Again, that plaintiffs' counsel reminded defendants to follow through with the earlier agreement to sign the formal agreement prepared on July 11, does not constitute an admission or change the fact that the evidence shows that the parties had entered into a binding settlement agreement on July 5.

12

binding nature of plaintiffs' July 4 offer.  The opinion solely addressed the question of enforceability under section 664.6.  Indeed, as already noted, we explicitly "express[ed] no opinion as to whether plaintiffs can enforce the July 4 offer by another method, such as a motion for summary judgment for breach of contract."  (*J.B.B. Investment Partners I*, at p. 991, fn. 4; see *Stewart*, *supra*, 134 Cal.App.4th at p. 1585.)

Defendants also argue that the material terms of the July 4 offer were not sufficiently certain to form the basis of a final agreement.  "A settlement agreement, like any other contract, is unenforceable if the parties fail to agree on a material term or if a material term is not reasonably certain."  (*Lindsay v. Lewandowski* (2006) 139 Cal.App.4th 1618, 1622; see Civ. Code, § 3390, subd. (e) [obligations that cannot be specifically enforced include "[a]n agreement, the terms of which are not sufficiently certain to make the precise act which is to be done clearly ascertainable"].)  As the trial court found, however, the July 4 offer—which Russo described in the email as plaintiffs' " 'FINAL OFFER' "—"included specific terms (settlement amount, payment deadline, release of claims, etc.) delineated in 10 separately numbered paragraphs, which expressly invited defendants' acceptance."  These material terms were unambiguous and clear, and therefore enforceable.  (See *Stewart*, *supra*, 134 Cal.App.4th at p. 1586, fn. 24.)[10]

Nor is there any merit to defendants' abbreviated argument that even if Fair did agree to the terms of the July 4 offer, he could not agree for all defendants.  First, as the trial court stated in its order, "Plaintiffs presented evidence demonstrating Mr. Fair was the sole person with the authority to enter into a binding settlement on behalf of all three

[10] Also unpersuasive is defendants' assertion that there was no meeting of the minds because Halliburton, plaintiffs' counsel, responded to Fair's first email on July 5, 2013, by stating that he did "not understand your email.  Are you rejecting [plaintiffs'] settlement offer or accepting it?"  (See *Panagotacos v. Bank of America* (1998) 60 Cal.App.4th 851, 855–856 [" '[T]erms proposed in an offer must be met exactly, precisely and unequivocally for its acceptance to result in the formation of a binding contract [citations]; and a qualified acceptance amounts to a new proposal or counteroffer putting an end to the original offer' "].)  However, as already discussed, after Halliburton posed this question, Fair proceeded to affirm over and over again that he accepted the July 4 offer, thereby removing any possible ambiguity.

13

entities."[11]  Second, Russo stated in the July 4 offer that if defendants did not pay the settlement funds by July 1, 2014, plaintiffs would "enter the Judgment against you [Fair] and *all other defendants . . . .*"  (Italics added.)  This language demonstrates that the offer expressly contemplated a settlement as to all parties.

We also reject defendants' claim that by filing the complaint in this matter on the afternoon of July 5, plaintiffs "terminated and rescinded their July 4 settlement proposal, which specifically was premised on the material term that [they] would stay all litigation and not file the complaint."  According to defendants, because the settlement offer had been rescinded by the time of Fair's emails later that afternoon insisting there was an agreement despite the fact that plaintiffs had filed the complaint, no contract was ever formed.  First, the July 4 offer did not state that plaintiffs would not file a complaint.  Rather, it stated that "[a]ll litigation would be stayed . . . ."  Thus, the filing of the complaint was not inconsistent with the July 4 offer.  Second, and more importantly, as the trial court stated in its order, "Defendants' contention that the complaint's filing invalidated the offer directly contradicts Mr. Fair's contemporaneous statement that the filing of the complaint had no impact whatsoever on the parties' settlement agreement (i.e., that it was *not* material, and did not change anything).  [Citation.]  Defendants' present contention (now in the midst of litigation, four years after-the-fact) that the filing of the complaint nullified the deal is irreconcilable with Defendants' statements at the time of the settlement."

Also without merit is defendants' claim that the July 4 offer could not form the basis of an enforceable agreement because it was procured through duress and violated rule 5-100 of the California Rules of Professional Conduct (Rules Prof. Conduct, rule 5-100), an ethical rule applying to attorneys, by threatening criminal charges against Fair if

---

[11] The court noted that the evidence showed that Fair "was the only Officer and Director of defendant Bronco RE Corp., which was the managing Member of both of the LLC defendants) . . . ."

he did not accept plaintiffs' offer.[12]  The July 4 offer did not involve a violation of rule 5-100.  As the plain language of Russo's email makes clear, even when mentioning Bernie Madoff and Ponzi schemes, Russo was threatening to expose Fair's alleged fraud in *civil litigation* if the parties did not settle, *not* by either expressly or impliedly threatening him with criminal charges "to obtain an advantage in a civil dispute."  (Rules Prof. Conduct, rule 5-100(A).)

Defendants further argue that the purported agreement fails because it violates the statute of frauds, which requires a signed written agreement in certain circumstances, including the sale of real property.  (See Civ. Code, § 1624, subd. (a)(3) [contracts that are invalid unless in writing and signed by the party to be charged include "[a]n agreement for the leasing for a longer period than one year, or for the sale of real property, or of an interest therein; such an agreement, if made by an agent of the party sought to be charged, is invalid, unless the authority of the agent is in writing, subscribed by the party sought to be charged"].)  Here, as plaintiffs point out in their respondents' brief, "the transaction between the [parties] was a settlement agreement, not a real property transaction.  [Plaintiffs] bought a fractional interest in an LLC.  [Citation.] Though the business of the LLC related to real property, [the agreement] is not for the transfer of that property, but settlement of claims related to the investments in two LLCs. The statute of frauds for real property was created to protect buyers and sellers of real property."  The statute of frauds and its requirements are plainly inapplicable to the circumstances of this case.  (See Civ. Code, § 1624, subd. (a)(3).)

For all of the foregoing reasons, we conclude no triable issues of material fact exist regarding whether defendants entered into a binding settlement agreement with plaintiffs on July 5, 2013.  The trial court properly granted plaintiffs' motion for summary adjudication as to the eighth cause of action for breach of contract in their first

---

[12] Rules of Professional Conduct, rule 5-100(A) provides:  "A member shall not threaten to present criminal, administrative, or disciplinary charges to obtain an advantage in a civil dispute."

amended complaint. (See § 437c, subd. (p)(1); see *Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 849.)

## B. *Sanctions*

On March 22, 2019, following oral argument in this case, the clerk of this court sent a letter to counsel advising that the court, acting on its own motion, was considering the imposition of sanctions on defendants and/or their counsel, in favor of plaintiffs and/or this court in case No. A152877 "for taking an appeal that is frivolous or filed for purposes of harassment or delay." At our request, both parties have filed supplemental briefing on this question. Plaintiffs' counsel also filed a declaration supporting the amount of monetary sanction requested and defendants waived argument on the issue of sanctions. (See Cal. Rules of Court, rule 8.276.)[13]

### 1.

"Section 907 provides, 'When it appears to the reviewing court that the appeal was frivolous or taken solely for delay, it may add to the costs on appeal such damages as may be just.' Rule 8.276(a) gives us the authority to 'impose sanctions . . . on a party or an attorney for: [¶] (1) Taking a frivolous appeal or appealing solely to cause delay. . . .' In explaining these provisions, our Supreme Court has explained 'an appeal should be held to be frivolous only when it is prosecuted for an improper motive—to harass the respondent or delay the effect of an adverse judgment—or when it indisputably has no merit—when any reasonable attorney would agree that the appeal is totally and completely without merit.' [Citation.]

"In determining whether an appeal indisputably has no merit, California cases have applied both subjective and objective standards. The subjective standard looks to the motives of the appealing party and his or her attorney, while the objective standard looks at the merits of the appeal from a reasonable person's perspective. [Citation.] Whether the party or attorney acted in an honest belief there were grounds for appeal

---

[13] All further rule references are to the California Rules of Court unless otherwise indicated.

makes no difference if any reasonable person would agree the grounds for appeal were totally and completely devoid of merit. [Citation.]

"The objective and subjective standards 'are often used together, with one providing evidence of the other. Thus, the total lack of merit of an appeal is viewed as evidence that appellant must have intended it only for delay.' [Citation.] An unsuccessful appeal, however, ' "should not be penalized as frivolous if it presents a unique issue which is not indisputably without merit, or involves facts which are not amenable to easy analysis in terms of existing law, or makes a reasoned argument for the extension, modification, or reversal of existing law." ' [Citation.]" (*Kleveland v. Siegel & Wolensky, LLP* (2013) 215 Cal.App.4th 534, 556–557 (*Kleveland*), citing, inter alia, *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 649-650.)

In the present case, "[a]lthough we recognize sanctions should be used sparingly to deter only the most egregious conduct [citation], we find them warranted here." (*Kleveland*, *supra*, 215 Cal.App.4th at p. 557.) That is because defendants' arguments on appeal are *not* "supported by a careful reading of the record or the law nor could these arguments be reasonably characterized as presenting unique issues or arguing for extension, modification, or reversal of existing law." (*Kleveland*, at p. 557.)

First, the history of this matter is relevant to our determination of the propriety of sanctions. (See *Bucur v. Ahmad* (2016) 244 Cal.App.4th 175, 192 ["Appellate courts can, and often do, consider prior conduct of attorneys and their clients in considering whether sanctions are appropriate"].) This case began almost six years ago, with a settlement offer to which Fair—a licensed attorney—agreed in writing some *six times*. (See *Barnard v. Langer* (2003) 109 Cal.App.4th 1453, 1463 [defendant attorneys "negotiated a fair and reasonable settlement which was accepted by a fully informed" plaintiff, who then challenged the agreed upon fee within days of settlement].)

Additional prior conduct is also relevant to our sanctions determination, including defendants' repeated attempts to arbitrate this matter, together with a tardy appeal to this court of one of the trial court's orders denying their motion to arbitrate, despite their failure to appeal the denial of their initial motion to arbitrate. (*J.B.B. Investment Partners*

17

*II*, *supra*, A145221.)  In addition, the trial court granted plaintiffs' special motion to strike a cross-complaint filed by defendants, after finding that defendants' claims did not constitute protected speech and defendants were not likely to prevail on the merits because all of the claims in the cross-complaint were protected by the litigation privilege. (Civ. Code, § 47, subd. (b)(2).)  We affirmed the court's order on appeal.  (*J.B.B. Investment Partners III*, *supra*, A152143.)  As we stated in our 2018 opinion affirming the grant of the anti-SLAPP motion, defendants "offered misleading quotes, taken out of context from the demand letter," to argue that plaintiffs' attorney was threatening criminal prosecution for Fair's alleged Ponzi scheme if Fair did not agree to pay plaintiffs $350,000, whereas he in fact "threatened no such thing." (*Ibid*.)  Defendants raised a similar argument in support of their motion for summary adjudication and in this appeal, which provides further evidence of frivolousness.  (See *Bucur v. Ahmad*, *supra*, 244 Cal.App.4th at p. 192.)

Defendants also offered misleading partial quotes from one of our own prior opinions in this case in which we reversed the trial court's judgment enforcing the settlement against defendants, pursuant to section 664.6.  They then relied on this misleading language to argue that this court found that no settlement in fact occurred. Our decision, however, was based on the narrow ground that the settlement document in question did not satisfy section 664.6's signature requirement.  (*J.B.B. Investment Partners I*, *supra*, 232 Cal.App.4th at p. 991 ["the trial court erred when it concluded that Fair's printed name at the bottom of the e-mail satisfied the strict signature requirements under . . . section 664.6"].)  In both their anti-SLAPP appeal and the present appeal, defendants have distorted the language and intent of our own 2014 opinion to support their claim that we held in that opinion that no settlement had been reached, which we explicitly stated in that opinion we were *not* doing.  (See *id.* at p. 991, fn. 4 [declining to address defendants' claims that no settlement was reached, stating, "[w]e also express no opinion as to whether plaintiffs can enforce the July 4 offer by another method, such as a

motion for summary judgment for breach of contract"];[14] cf. *Kleveland*, *supra*, 215 Cal.App.4th at p. 557 [in awarding sanctions against defendants, appellate court noted that defendants appeared "merely to pretend the results of [prior related] litigation were something they clearly were not" and that they "brazenly misrepresented the record and/or obscured facts"].)

In addition, in their supplemental briefing opposing sanctions, defendants purport to demonstrate the merit of this appeal by asserting that "there are several potential triable issues of material fact regarding the existence, actual terms, and enforceability of the parties' purported July 5, 2013 settlement agreement." They then repeat in summary form the same completely meritless arguments raised in the trial court and in their opening brief on appeal, in which they offered selective facts, misrepresented the record, and/or argued completely inapplicable law. (See *Kleveland*, *supra*, 215 Cal.App.4th at p. 557 [frivolousness of appeal was shown in party by defendants' use of "selective 'facts' from the record" and their asking appellate court "to consider 'evidence' that was explicitly rejected by the trial court . . . , while ignoring the relevant statutes and case law"]; *Kurokawa v. Blum* (1988) 199 Cal.App.3d 976, 996 ["The briefs state the record loosely, cite strained authorities and discuss legal principles in a vacuum"].)

Two of the many possible examples of this conduct include defendants' claim, yet again, that the repeated express statements by Fair on July 5, 2013, that he agreed to the settlement offer were in fact only an "expression of his hope that the parties could reach a final settlement," and their assertion that the agreement "at least arguably" violated the statute of frauds because "the subject investments concern investments in real property," when the only transaction at issue plainly was the settlement agreement, not a real

---

[14] Even in their supplemental letter brief opposing sanctions, defendants again use a partial quote from our 2014 opinion to falsely claim that we there stated that "Fair's responses to [plaintiffs'] July 4 settlement proposal did not create a binding settlement agreement because the 'plain language of the July 4 offer made it clear that . . . future paperwork was forthcoming.' " (Quoting *J.B.B. Investment Partners I*, *supra*, 232 Cal.App.4th at pp. 989–990.)

19

property transaction. Such arguments can only be described as "indisputably without merit." (*Kleveland*, *supra*, 215 Cal.App.4th at p. 557.)

For all of these reasons, we conclude that "any reasonable attorney would agree that the appeal is totally and completely without merit" and would not have raised the arguments defendants make on appeal, which are merely rehashed in the supplemental briefing in opposition to imposition of sanctions. (*Kleveland, supra*, 215 Cal.App.4th at p. 556.)[15] In light of this conclusion, we need not directly address plaintiffs' additional arguments that there is evidence demonstrating that defendants filed this appeal for the subjective purpose of delay because we find that the history of this case and the indisputable "total lack of merit" of this appeal provide strong evidence of defendants' subjective intent, i.e., that they " 'must have intended it only for delay.' " (*Kleveland,* at p. 557; see *Barnard v. Langer*, *supra*, 109 Cal.App.4th at p. 1465 ["The facts of the case before us and the undisputed facts about Barnard's behavior in other cases make it clear that this appeal is both frivolous and taken solely for the purpose of delay"].)

In short, we are persuaded, by clear and convincing evidence, that the pursuit of this appeal was frivolous, and warrants sanctions. (See *Kleveland, supra*, 215 Cal.App.4th at p. 558.)

_____

[15] In support of their opposition to imposition sanctions, defendants have submitted the declarations of two experienced outside attorneys with whom defendants' counsel conferred in connection with the briefing of this appeal. One of those attorneys stated, "I reviewed the briefing and expressed to [defendants' counsel] my belief that the Appeal had merit. I never communicated to them that I believed the Appeal was made in bad faith, as I never formed such an opinion." The second attorney made a very similar statement, adding that "I expressed to them my belief that the [defendants] had a favorable probability of prevailing." Again, in light of the evidence of the total lack of merit of the appeal, together with the history of this case, the vague statements by two additional attorneys that they believed this appeal "had merit" does not change our conclusion. (Cf. *Kleveland, supra*, 215 Cal.App.4th at pp. 556–557 ["Whether the party or attorney acted in an honest belief there were grounds for appeal makes no difference if any reasonable person would agree the grounds for appeal were totally and completely devoid of merit"].)

**2.**

As to the appropriate amount of the sanctions, " '[f]actors relevant to determining the amount of sanctions to be awarded to a party responding to a frivolous appeal include "the amount of respondent's attorney fees on appeal; the amount of the judgment against appellant; the degree of objective frivolousness and delay; and the need for discouragement of like conduct in the future." ' [Citations.]" (*Kleveland, supra*, 215 Cal.App.4th at p. 558.)

Here, plaintiffs' counsel has filed a declaration estimating that the firm's work defending this appeal, which does not include the amount spent on plaintiffs' consolidated attorney fees appeal (case No. A153698), will total $42,340.00. Counsel also states that costs incurred on appeal total $2,314.64.[16] Considering the many years' delay in payment of the settlement amount of $250,000, to which Fair repeatedly agreed in writing, and which led to the expenditure of attorney fees well beyond that initial settlement amount over the course of this litigation; the high degree of objective frivolousness of the appeal, as discussed in part I.B.1, *ante*; and the need to deter such improper conduct in the future, we believe that sanctions covering plaintiffs' attorney fees and costs on appeal are appropriate. (See *Kleveland, supra*, 215 Cal.App.4th at p. 558; see also *Keitel v. Heubel* (2002) 103 Cal.App.4th 324, 343 ["The amount of attorney fees reasonably incurred in responding to a frivolous appeal is an appropriate measure of sanctions"].)

We will therefore award plaintiffs a total of $44,654.64 in attorney fees and costs as sanctions.

**3.**

Finally, we conclude sanctions should be imposed against both defendants and their attorneys for the filing of this frivolous appeal. (See *Pierotti v. Torian* (2000) 81 Cal.App.4th 17, 36 ["We may order a litigant, his attorney, or both to pay sanctions on

---

[16] In their briefing in opposition to sanctions, defendants do not challenge the specific amount of fees and costs plaintiffs have requested.

21

appeal"].)  Defendants—through Fair, an inactive member of the State Bar of California—*and* their attorneys initiated an appeal that was totally meritless, following a lengthy history of dubious litigation, which they doggedly pursued over many years despite Fair's repeated and insistent acceptance of an offer to settle this case at its inception, in July 2013.  (See *Pierotti*, at pp. 36-37; *In re Marriage of Schnabel* (1994) 30 Cal.App.4th 747, 756; see also Bus. & Prof. Code, § 6068, subd. (c) [it is an attorney's duty "[t]o counsel or maintain those actions, proceedings, or defenses only as appear to him legal or just"]; accord, Rules Prof. Conduct, rule 3.1(a); compare *Summers v. City of Cathedral City* (1990) 225 Cal.App.3d 1047, 1080 [declining to impose sanctions against plaintiff after concluding appeal resulted solely from failure of counsel to adequately research merits of plaintiff's case before undertaking appeal].)

Accordingly, we will impose the sanctions, as set forth in part I.B.2., *ante*, of this opinion, jointly and severally against defendants and their attorneys, Patrick Baldwin and Christopher Mader.  (See *Pierotti v. Torian*, *supra*, 81 Cal.App.4th at pp. 36–37; *In re Marriage of Schnabel*, *supra*, 30 Cal.App.4th at p. 756.)  This opinion constitutes a written statement of our reasons for imposing sanctions.  (See *Bucur v. Ahmad*, *supra*, 244 Cal.App.4th at p. 195.)  A copy of this opinion shall be forwarded to the State Bar of California, in compliance with the requirements of Business and Professions Code section 6086.7 subdivision (a)(3).  (See *Bucur*, at p. 195.)

## II.  *Plaintiffs' Appeal of the Denial of their Motion for Attorney Fees*

In case No. A153698, plaintiffs contend the trial court should have awarded them attorney fees for the entire dispute, consistent with Civil Code section 1717's mutuality requirement and public policy or, at a minimum, should have awarded them fees as prevailing parties on defendants' motions to compel arbitration and the related appeal.[17]

---

[17] On appeal, plaintiffs do not specifically challenge the court's finding that they were not entitled to fees for defending against defendants' cross-complaint beyond those awarded in connection with their anti-SLAPP motion or for fees incurred in opposing defendants' motion to stay the matter pending appeal or the order granting the anti-SLAPP motion.

22

We review a determination of the legal basis for an award or denial of attorney fees de novo, as a question of law. (*Brown Bark III, L.P. v. Haver* (2013) 219 Cal.App.4th 809, 821 (*Brown Bark*); *Frog Creek Partners, LLC v. Vance Brown, Inc.* (2012) 206 Cal.App.4th 515, 523 (*Frog Creek*).)[18]

"A party may not recover attorney fees unless expressly authorized by statute or contract. [Citations.] In the absence of a statute authorizing the recovery of attorney fees, the parties may agree on whether and how to allocate attorney fees. [Citation.] They may agree the prevailing party will be awarded all the attorney fees incurred in any litigation between them, limit the recovery of fees only to claims arising from certain transactions or events, or award them only on certain types of claims. . . . [Citation.] [¶] To ensure mutuality of remedy, however, [Civil Code] section 1717 makes an attorney fee provision reciprocal even if it would otherwise be unilateral either by its terms or in its effect. [Citations.]" (*Brown Bark*, *supra*, 219 Cal.App.4th at pp. 818–819, citing § 1021 ["Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys . . . is left to the agreement, express or implied, of the parties"]; see also § 1033.5, subd. (a)(10).)

Civil Code Section 1717, subdivision (a) provides in relevant part: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs."

---

[18] Defendants argue that the correct standard of review is abuse of discretion. Although "it is a discretionary trial court decision on the propriety or amount of statutory fees to be awarded . . . , a determination of the legal basis for an attorney fee award is a question of law to be reviewed de novo. [Citation.]" (*Carver v. Chevron U.S.A., Inc.* (2002) 97 Cal.App.4th 132, 142.) Thus, in this case, where we must review "the applicable statutes and provisions of the contract," and the underlying facts are not in dispute, our review is de novo. (*Ibid.*)

## A.

Plaintiffs first argue that the court erred when it refused to award them all of the attorney fees they incurred in litigating their initial and first amended complaints in the dispute with defendants, pursuant to Civil Code section 1717. We disagree.

The only contracts plaintiffs have sought to enforce throughout this case are (1) investment agreements between the parties that were explicitly *not* based on the operating agreements, which plaintiffs have stated they never saw before they filed their action against defendants,[19] and (2) the July 2013 settlement agreement, which the parties agree contained no attorney fee provision. Plaintiffs nevertheless argue that because *defendants* claimed entitlement to fees in their now-stricken cross-complaint pursuant to the operating agreements, which plaintiffs never signed and which contains an arbitration-related fees provision, plaintiffs are entitled to fees in the present matter pursuant to those agreements under Civil Code section 1717's reciprocity requirement.

Again, Civil Code section 1717 requires reciprocity of remedy in the award of fees in "any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party." The plain language of the statute thus makes clear that its reciprocity principles "have 'limited application. [They] cover[] *only* contract actions, where the theory of the case is breach of contract, and *where the contract sued upon* itself specifically provides for an award of attorney fees incurred to enforce *that* contract. . . .' " (*Brown Bark*, *supra*, 219 Cal.App.4th at p. 820, italics added.) Civil Code section 1717 is therefore wholly inapplicable here, where plaintiffs' initial complaint attempted to hold defendants responsible for their alleged breach of a contract unrelated to the operating agreements and where they subsequently sought to enforce the settlement agreement, which contains no fees provision. This is so regardless of the

---

[19] Indeed, the only claims plaintiffs made concerning the operating agreements were that they were not a party to those agreements. As they stated in their first amended complaint, "plaintiffs are not bound by the terms of either of the operating agreements, which plaintiffs never saw and to which they never agreed . . . ."

theory for recovery of fees defendants may have asserted in their unsuccessful cross-complaint, for which plaintiffs have already been awarded their fees under section 425.16, subdivision (c)(1).[20]  In addition, as we discuss in part II.B., *post*, of this opinion, even were the operating agreements the pertinent contracts, those agreements contain attorney fees provisions that are only applicable to *arbitration* of any disputes between the parties.

## B.

Plaintiffs next contend that even if they are not entitled to recover all of the attorney fees they incurred while litigating their action against defendants, the court should at least have awarded them fees as prevailing parties on defendants' motions to compel arbitration and the related appeal, which they claim were governed by the arbitration provision in the operating agreements.  Plaintiffs cite to *Brown Bark* in which the court explained that Civil Code section 1717 makes an otherwise unilateral attorney fee provision reciprocal when, inter alia, " 'a person sued on a contract containing a provision for attorney fees to the prevailing party defends the litigation "by successfully arguing the inapplicability, invalidity, unenforceability, or nonexistence of the same contract." [Citation.] . . . ' [Citation.]  Accordingly, [Civil Code] section 1717 allows a party who defeats a contract claim by showing the contract did not apply or was unenforceable to nonetheless recover attorney fees under that contract if the opposing party would have been entitled to attorney fees had it prevailed.  [Citation.]" (*Brown Bark*, *supra*, 219 Cal.App.4th at p. 819, quoting *Santisas v. Goodin* (1998) 17 Cal.4th 599, 611.)

---

[20] We find unpersuasive plaintiffs' labored attempt to demonstrate they are entitled to attorney fees under the operating agreements, as when they state, "In many respects, it would be fair to characterize the July 5[, 2013] Agreement as a modification of [plaintiffs'] agreement to invest in [defendants'] LLCs, as it set up a process to govern the relationship between the parties until [defendants] either sold [plaintiffs'] interests in the LLC or the stipulated judgment came into effect."

25

*Brown Bark* is inapposite.  First, the present case does not involve a unilateral attorney fee provision.  (See *Brown Bark*, *supra*, 219 Cal.App.4th at p. 819.)  The identical arbitration provision in each of the two operating agreements (for Cameron and Boulevard) is expressly reciprocal.  Second, and most important, unlike the situation discussed in *Brown Bark*, the reciprocity requirement of Civil Code section 1717 is inapplicable here because defendants would *not* have been entitled to attorney fees had they prevailed on the motions to compel arbitration or the related appeal.  (See *Brown Bark*, at p. 819; accord, *Hsu v. Abbara* (1995) 9 Cal.4th 863, 870 [it is now settled that a party is entitled to fees under Civil Code section 1717 " 'even when the party prevails on grounds the contract is inapplicable, invalid, unenforceable or nonexistent, *if the other party would have been entitled to attorney's fees had it prevailed*.' "], italics added.)

The arbitration provision in the Cameron and Boulevard operating agreements provides in relevant part:  "19.5  Disputes.  Any dispute, disagreement, claim or controversy among the Members arising out of or relating to this Agreement . . . or any breach of this Agreement ('Dispute') shall be subject to the negotiation, mediation and arbitration provisions contained herein.  [If not settled by good faith negotiation and/or mediation], the Dispute shall be finally settled by shall be settled by [*sic*] arbitration to be held in Marin County, California . . . by a panel of three (3) arbitrators qualified to consider the matter in dispute.  The arbitrators may grant injunctions or other relief in which dispute or controversy.  The decision of a majority of the arbitrators shall be final, conclusive and binding upon the parties to the arbitration; and any party shall be entitled to cause judgment on the decision or award of the arbitrators to be entered in any court of competent jurisdiction. . . . *The Member initiating the arbitration shall pay the costs, deposits and expenses of such arbitration and the prevailing party shall be awarded its attorneys' fees and expenses, in addition to all other relief awarded by the arbitrators, provided that if the arbitrators determines [sic] that a Member has initiated an arbitration without a reasonable basis for doing so, then the arbitrators shall assess against that Member all costs of the Company and the other Members relating to*

26

*arbitration, including attorneys' fees and expenses of the Company and such other Members."* (Italics added.)

Plaintiffs claim that the italicized language in this provision is ambiguous as to whether only an arbitrator may award attorney fees and whether the award must be made only as to fees incurred in the arbitration itself. We do not agree that the language is ambiguous, at least with respect to its applicability to the facts of this case. First, the first part of the sentence containing the fees provision makes plain that it is the prevailing party *in the arbitration* who is to be awarded attorney fees, regardless of whether the language is arguably ambiguous as to whether it is only the arbitrators, and not the court, who may make such an award. This language clearly does not authorize recovery of prevailing party fees incurred in separate court litigation. (See §§ 1021, 1033.5, subd. (a)(10).) The motions to compel and the related appeal in this case solely involved litigation in the trial court and this court; there was no prevailing party in any arbitration. Second, to the extent plaintiffs argue that the latter part of the fees-related sentence— which authorizes an assessment of fees from a party who has initiated arbitration absent a reasonable basis for doing so—is applicable here, the language makes clear that it is only the *arbitrators*, in the arbitration proceeding, who may assess such fees. Because it was the court, and not arbitrators, that addressed any possible efforts by defendants to "initiate[] an arbitration without a reasonable basis for doing so," this portion of the arbitration provision would not entitle plaintiffs to fees in defending against defendants' motions to compel arbitration.

Thus, the fact that defendants *claimed* a right to fees under the arbitration provision in the operating agreements if they succeeded in their efforts to compel arbitration is of no consequence. Because defendants would not have been entitled to recover attorney fees under the arbitration provision had they prevailed on their motions to compel or on appeal, plaintiffs' reliance on *Brown Bark* and Civil Code section 1717

27

to argue for mutuality of remedy is unavailing.[21]  (See *Hsu v. Abbara*, *supra*, 9 Cal.4th at p. 870; *Brown Bark*, *supra*, 219 Cal.App.4th at p. 819.)[22]

## DISPOSITION

In case No. A152877, the judgment is affirmed.  Defendants and their attorneys, Patrick Baldwin and Christopher Mader, are ordered to pay $44,654.64 in sanctions to plaintiffs for bringing this frivolous appeal.  This obligation is joint and several, and sanctions shall be paid no later than 30 days after the date the remittitur is issued.  A copy of this opinion shall be forwarded to the State Bar of California upon issuance of the remittitur.

---

[21] *Frog Creek*, *supra*, 206 Cal.App.4th 515, on which plaintiffs also rely to support their claim of entitlement to fees incurred in defeating defendants' efforts to arbitrate this matter, is likewise inapplicable to the present situation.  Plaintiffs completely miss the point of *Frog Creek* when they argue that the court's statement in that case that "when a party *defeats* an independent petition to compel arbitration, the action is terminated and the prevailing party on the petition is entitled to fees under Civil Code section 1717" (*id*. at p. 533) supports their position.  *Frog Creek* involved very different facts—the parties had entered into a contract with both an arbitration clause and a separate attorney fees provision—and resolved a completely different issue:  whether a plaintiff who files a lawsuit and, while that lawsuit is still pending, defeats the defendant's petition to compel arbitration is "entitled to recover attorney fees, even if the plaintiff ultimately loses the substantive contract dispute[.]" (*Id*. at p. 520.)  Division Five of this District held, consistent with other Courts of Appeal, that "defeating a petition to compel arbitration filed in a pending contract action does not justify a grant of fees under Civil Code section 1717 where the merits of the contract claims remain pending in that action." (*Frog Creek*, at p. 535.)  *Frog Creek* is of no assistance to plaintiffs.

[22] Plaintiffs note in their briefing that they "prevailed in every aspect of this dispute, having won their summary adjudication motions, striking [defendants'] cross-complaint, and defeating the arbitration motions and appeal."  While we certainly understand plaintiffs' frustration about their inability to recover most of their fees, despite these repeated wins, we cannot ignore California law, under which each party is expected to bear its own fees in the absence of an applicable statute or an attorney fees provision in a valid contract. (§ 1021; *Brown Bark*, *supra*, 219 Cal.App.4th at pp. 818–819.)  As already discussed, however, plaintiffs *are* entitled to sanctions in the amount of their attorney fees and costs on appeal in case No. A152877.  (See pt. I.B., *ante*.)

In case No. A153698, the order is affirmed, and the parties shall each bear their own costs on appeal.  (See rule 8.278(a)(5).)

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Stewart, J.

*J.B.B. Investment Partners, Ltd. et al. v. Fair et al.* (A152877 & A153698)

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| J.B.B. INVESTMENT PARTNERS LTD. et al.,<br><br>     Plaintiffs and Respondents,<br><br>v.<br><br>R. THOMAS FAIR et al.,<br><br>     Defendants and Appellants. | A152877<br><br>(San Mateo County<br>Super. Ct. No. CIV522693) |
| J.B.B. INVESTMENT PARTNERS LTD. et al.,<br><br>     Plaintiffs and Appellants,<br><br>v.<br><br>R. THOMAS FAIR et al.,<br><br>     Defendants and Respondents. | A153698<br><br>(San Mateo County<br>Super. Ct. No. CIV522693)<br><br>**ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PARTIAL PUBLICATION NO CHANGE IN JUDGMENT** |

THE COURT:

It is ordered that the unpublished opinion filed herein on June 4, 2019, be modified as follows:

On page 16, the last sentence in the paragraph under the heading "**B. Sanctions**" (before the rules citation), is changed to read:

     Plaintiffs' counsel also filed a declaration supporting the amount

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II of the Discussion.

1

of monetary **sanctions** requested and defendants waived argument on the issue of sanctions.

On page 18, the last sentence of the first full paragraph (before the *Bucur* citation), is changed to read:

Defendants raised a similar argument in their **opposition to the** motion for summary adjudication and in this appeal, which provides further evidence of frivolousness.

On page 20, the first sentence of footnote 15 is changed to read:

In support of their opposition to imposition **of** sanctions, defendants have submitted the declarations of two experienced outside attorneys with whom defendants' counsel conferred in connection with the briefing of this appeal.

There is no change in the judgment.

Dated: _____                    _____
                                                                         Kline, P.J.

2