Filed 6/12/25  Birdsall v. Helfet CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| GARY BIRDSALL ET AL., <br><br>     Plaintiffs and Respondents, <br><br> v. <br><br> BARTON HELFET, <br><br>     Defendant and Appellant. | A170596 <br><br> (San Francisco County <br> Super. Ct. No. CGC-21-5944428) |

Gary Birdsall was stopped for traffic when his vehicle was rear-ended by Barton Helfet.  Gary and his wife Pamela quickly retained an attorney who initiated contact with Helfet's insurer and who, prior to filing suit, sent the insurer a "policy limits" settlement demand of $100,000.  The demand stated that the deadline to accept was 30 days later, at 3:00 p.m., by which the insurer had to send the attorney three items:  (1) a "standard . . . bodily injury release" to be executed by "Gary Birdsall and Pamela Birdsall," (2) a settlement draft and check payable to "Gary Birdsall and Pamela Birdsall" and their attorney, and (3) evidence confirming the policy limits.

Six days before the deadline, the insurance company faxed to the attorney a letter that stated at the top in large boldface it was a "**CLAIM SETTLEMENT**," and the first line of which read, "We accept your offer and agree to pay $100,000 . . . ."  The letter also enclosed a standard release and certified proof of the policy limits.  The next day, the insurer sent by

1

overnight mail the $100,000 check, payable as requested. Then, four days before the deadline, the insurer faxed another letter to the attorney stating its belief that all three conditions had been met, and asking the attorney to contact him if anything else was required. The attorney did not respond.

Meanwhile, the insurer learned that the release enclosed in the acceptance letter had Gary releasing Helfet and Pamela, listing her as a releasee rather than a releasor, and sent the attorney a corrected version of the release that was received by the attorney 65 minutes after the 3:00 p.m. deadline. The next day, the attorney sent a letter to the insurance company complaining that the original release was not satisfactory—and the corrected release too late.

The attorney thereafter filed a lawsuit for the Birdsalls. Helfet's answer included an affirmative defense of settlement. The Birdsalls moved for summary adjudication of the defense, which the trial court granted, and the case proceeded to trial without considering the issue of settlement, at the conclusion of which the jury awarded Gary $4,642,190 and Pamela $550,000.

Helfet appeals, asserting two arguments, the first of which is that the trial court erred in granting summary adjudication of the defense. We agree, and we reverse.

## BACKGROUND

### The General Setting

On August 13, 2020, Gary Birdsall, driving a commercial cargo van on the Bay Bridge, was stopped for traffic, when his vehicle was struck from the rear by a car driven by Barton Helfet. Within weeks, Gary and his wife Pamela (when referred to collectively, plaintiffs) retained attorney Jacob Shapiro. Mr. Shapiro learned that USAA Casualty Insurance Co. (USAA) insured Helfet, and by letter of October 5 advised USAA of his

2

representation.

By letter of October 6, a USAA representative acknowledged Mr. Shapiro's representation, confirming that USAA would "no longer communicate with your client," further advising that, "[p]ursuant to [Mr. Shapiro's] request," Helfet's insurance policy had "Bodily Injury Liability limits with a $100,000 per person maximum and a $300,000 per accident maximum."

On March 19, 2021, Mr. Shapiro sent to USAA claims handler Jason Thompson a letter that began as follows:  "Our firm represents Gary Birdsall and his spouse, Pamela Birdsall, the plaintiffs in the above-referenced accident claim.  This letter sets forth a settlement proposal for your company's consideration.  Our clients are making this proposal because they are in need of funds at the present time.  As evidenced by the over 400,000 miles (photo enclosed) on his 2013 Ford van, Mr. Birdsall was an independently contracting delivery driver and he has been unable to work since the incident.  Therefore being in financial distress we are writing to see whether your company will be willing to send us the proceeds under the policy as part of a full and final settlement.  This will include any and all claims, including Ms. Birdsall's loss of consortium claim, and Mr. Birdsall will be responsible for any and all liens."

The letter went on to discuss "Liability Issues" and "Medical Treatment & Injury Review," and then set forth a "**POLICY LIMIT SETTLEMENT DEMAND**" that read as follows:  "Regarding said limit, this policy limit demand is relying on your company's representation that the USAA Insurance policy covering Mr. Helfet has a limit of $100,000.00 per person for bodily injury.  This demand will expire, and be automatically revoked, on April 19, 2021 at 3:00 p.m.  This may be the only opportunity USAA will have

3

to resolve this claim within their insured's policy limit.  Acceptance can only be made by delivery of the following items to Shapiro Legal Group . . . .

"1) A standard USAA bodily injury release in the amount of $100,000.00 to be executed by Gary Birdsall and Pamela Birdsall . . . . [¶]

"2) A settlement draft in the amount of $100,000.00 payable to 'Gary Birdsall, Pamela Birdsall, and Shapiro Legal Group.' . . . [¶]

"3)  A copy of the declaration page for the applicable policy indicating the $100,000.00 per person limit attached to a sworn affidavit by an officer of the insurance company attesting to its authenticity and that said amount represents the bodily injury limit applicable on 8/13/20."  (Capitalization and boldface omitted.)

On April 13, Thompson sent Mr. Shapiro a facsimile letter labeled in extra-large, boldfaced font that read at the top "**CLAIM SETTLEMENT**." And the substance of the letter read as follows:

"**Review Claim Settlement**

"April 13, 2021

"Dear Jacob Shapiro,

"We accept your offer and agree to pay $100,000.00 concerning the following claim:

"Your client:   Gary Birdsall

"USAA policyholder: Barton M Helfet

"Claim number:  008956651-004

"Date of loss:   August 13, 2020

"Loss location:  San Francisco, California

"We believe this offer represents the fair value of the claim.

"A claim release is attached.  We will forward payment upon receipt of the release signed by your client.  Spouse's signature is also required. . . . [¶]

4

"This offer to settle is all inclusive of any and all medical billing, liens and each party to bear their own fees and costs."

As indicated, Thompson's letter enclosed a USAA "**CA BODILY INJURY RELEASE**," which as pertinent to the issues here provided in part that "The undersigned Gary Birdsall, for and in consideration of the sum of (One Hundred Thousand Dollars and 00/100) $100,000 do hereby release and forever discharge Barton M. Helfet and Pamela Birdsall (USAA's Insured or USAA) (hereinafter referred to as 'Releasees') . . . ." The release contained the waiver under Civil Code section 1542; and the signature page also contained signature lines for witnesses, a signature line that identified Gary, and another signature line below, which was left blank. The letter also included a certified copy of the declarations page for Helfet's policy, which confirmed the applicable policy limits.

On April 14, USAA sent to Mr. Shapiro by overnight delivery a check dated April 13 in the amount of $100,000 payable, as requested, to "Gary Birdsall and Pamela Birdsall and Shapiro Legal Group." Mr. Shapiro received it on April 15.

On April 15, Thompson sent a facsimile to Mr. Shapiro that read in pertinent part as follows:

"We are contacting your office to follow up with regard to our acceptance of your policy limit demand for your client's claim. You set forth the following conditions as part of your demand:

"1) USAA BI release – which was sent 4/13/21

"2) Settlement draft – which was received by your office 4/15/21

"3) Certified copy of our insured's declarations page – which was sent attached to our correspondence dated 4/13/21

"Our understanding is that we met all required conditions outlined in

your demand letter.  If you require anything else, please contact USAA."

Mr. Shapiro did not respond.

The next communication came from USAA when, on April 19, Thompson faxed Mr. Shapiro another letter, again confirming the settlement. This facsimile enclosed a revised release that corrected the error on the original release that had mistakenly named Pamela as a releasee.  The revised release removed Pamela as a releasee and added her name as a releasor to the signature line.

Mr. Shapiro received the letter and revised release at approximately 4:05 p.m., some 65 minutes after the deadline imposed by the settlement demand letter.

The next day, April 20, Mr. Shapiro sent Thompson a letter that provided in its entirety as follows:

"Dear Mr. Thompson:

"The purpose of this correspondence is to inform you that your company failed to execute the terms of acceptance as outlined in the March 19, 2021 offer.  While we are under no legal obligation to explain why, we have decided to do so as a matter of professional courtesy.

"As you know, acceptance required the delivery of three items by the deadline.  The first item was a release 'to be executed by Gary Birdsall and Pamela Birdsall'.  This is not what USAA sent.  (Enclosed)  This is not a release to be executed by Pamela Birdsall.  Pamela Birdsall should be listed as a releasor along with Gary Birdsall.  They are the claimants releasing their claims.  Not only is she not listed as a releasor, and not listed in the signature section, but the only place she is listed is as a releasee along with Barton Helfet.  She is only listed, falsely, as a USAA insured.  This is not a release to be executed by Gary Birdsall and Pamela Birdsall.  This is a

6

document to release Pamela Birdsall and Barton Helfet from liability. In short, by any objective measure, this is not a release to be executed by Pamela Birdsall and therefore this is not item one.

"As there was no execution of the terms of acceptance prior to the deadline, we are returning the original check to your company.

"We suggest you consult with your legal department. If counsel is assigned we would appreciate them contacting us at their earliest convenience to discuss the further handling of this matter."

**The Lawsuit**

On August 12, represented by Mr. Shapiro, plaintiffs filed a complaint against Helfet. Gary sought compensation for his injuries, medical expenses, and lost income, Pamela for loss of consortium.

On December 1, Helfet filed his answer that included various affirmative defenses, one of which was that "each and every cause of action therein [the complaint] has been previously extinguished by a prior compromise and settlement, with consideration tendered to Plaintiff[s], which then bars this lawsuit."

On January 10, 2022, plaintiffs filed a motion for summary adjudication of the affirmative defense. The motion essentially argued that there was no settlement as a matter of law because the original release was not valid and the corrected release, sent just minutes after the purported 3:00 p.m. deadline, was too late. The motion was accompanied by a declaration of Mr. Shapiro that attached 11 exhibits, the correspondence described above. The motion was set for hearing on May 18.

On May 4, Helfet filed opposition. The opposition included a declaration of attorney Dominique Marangoni-Simonsen that had nine attachments, most, if not all, duplicative of those submitted by Mr. Shapiro.

7

Helfet's opposition also included a memorandum of points and authorities that essentially argued: (1) there was mutual consent and thus a valid contract; (2) the original release effectively met the terms of acceptance because the release of Pamela was obviously a typographical error that was of no consequence, and, in any event, easily correctible; and (3) plaintiffs could not disavow the settlement when they failed to respond to USAA's inquiry sent several days before the deadline for acceptance whether they needed anything else.

Plaintiffs filed a reply, and the matter came on for hearing on May 18 before the Honorable Richard Ulmer, who had apparently issued a tentative ruling granting the motion.[1] A brief hearing was held, resulting in a 10-page reporter's transcript, at the conclusion of which Judge Ulmer took the matter under submission. That same day, Judge Ulmer signed without change an argumentative two-page order prepared by Mr. Shapiro granting the motion—an order that did not even mention, much less confront, fundamental contract law.

Helfet filed a petition for writ of mandate from the order, which we summarily denied.

On January 18 and 19, 2024, the parties appeared for a pretrial conference before Judge Christopher Hite, to whom the case had been assigned for trial. Judge Hite confirmed Judge Ulmer's order granting the summary adjudication, thus precluding any argument or consideration of it at trial. He also considered plaintiffs' second motion in limine to exclude evidence or argument concerning seat belt use, and took that issue under submission. Trial began on January 22, in the course of which Judge Hite

---

[1] No tentative ruling is in the record.

8

granted plaintiffs' motion in limine, and excluded all evidence, argument, and instruction about Gary's failure to wear a seat belt.

As set forth in Helfet's brief, the evidence included that Gary sustained significant injuries, including multiple fractures to his neck and back, a broken leg, lacerations and bruising on both legs, bruising to his chest and rib cage, and a left-arm degloving where his skin was torn away, and underwent operation for the broken bones in his neck and back. He also sustained a mild, but permanent, traumatic brain injury, with small subdural hematomas that caused memory problems, challenges when engaging in family events, some speech and language difficulties, cognitive challenges, and fear of driving that prevented him from continuing to work as a commercial delivery driver.

Helfet contested liability, arguing that he was faced with an emergency situation and that Gary was comparatively at fault for having come to an unexpected stop in moving traffic, presumably because of a mechanical defect.

The jury returned a verdict for plaintiffs, finding that Helfet was negligent, that Gary was not, and awarding Gary $4,642,190.86 in damages and Pamela $550,000. Judgment was entered on February 22.

On May 6, Judge Hite awarded plaintiffs costs of $17,608.89, and the judgment was amended to reflect that.

Meanwhile, Helfet moved: (1) for new trial or remittitur, (2) to vacate and enter a different judgment, and (3) for judgment notwithstanding the verdict. On May 6, Judge Hite entered orders denying the motions.

On May 20, Helfet filed his appeal from the judgment, the amended judgment, and the orders.

## DISCUSSION

### The Standard of Review

As noted, Helfet argues that granting summary adjudication was error, our review of which is "procedurally identical" to that for summary judgment. (*Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972.)  So, "[w]e review a grant of summary judgment de novo; we must decide independently whether the facts not subject to a triable dispute warrant judgment for the moving party as a matter of law.  [Citations.]" (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.)  Put another way, we exercise our independent judgment, and decide whether undisputed facts have been established that negate the defense.  (*Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 487.)  Doing so, "[w]e accept as true the facts . . . in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn from them."  (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 67.)  And we must " ' "liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." ' [Citation.]"  (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1039; see generally *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 253–254.)

As to what that means for us—as it does for the trial court—is described in the leading practical treatise this way:  "The court's sole function on a motion for summary judgment is issue-finding, not issue-determination. The judge must simply determine from the evidence submitted whether there is a 'triable issue as to *any* material fact.'  [CCP § 437c(c) (emphasis added); [citations]].  [¶]  'There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable

10

standard of proof.' [*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850][.] [¶] If there is a single such issue, the motion must be denied. If not, the motion must be granted. [Citation.]

"(On a motion for summary adjudication, the test is whether there is any 'triable issue of material fact' as to the particular claim or defense sought to be adjudicated.)" (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2025) ¶ 10:270, italics omitted.)

Applying well settled contract law, we find a triable issue of material fact here.

**Summary Adjudication Was Improperly Granted**

" 'A settlement agreement is a contract, and the legal principles which apply to contracts generally apply to settlement contracts. [Citation.] An essential element of any contract is "consent." [Citations.] The "consent" must be "mutual." [Citations.] . . . .' ' "The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe. [Citation.]" ' " (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 789; accord, *J.B.B. Investment Partners, Ltd. v. Fair* (2019) 37 Cal.App.5th 1, 11.)

"The interpretation of the purported acceptance or rejection of an offer is a question of fact. [Citation.] . . . [And] the test is what a reasonable person in the position of the parties would have thought it meant. [Citation.]" (*Guzman v. Visalia Community Bank* (1999) 71 Cal.App.4th 1370, 1376–1377.)

The outward manifestations here included USAA's letter that read at the top "**CLAIM SETTLEMENT**." That letter opened with the statement, "we accept your offer," and in it USAA sent Mr. Shapiro two of the three

11

items in his demand letter—a standard form release and certified proof of the policy limits. The third item was sent the next day.

Conceding, as they must, that USAA provided the second and third items in Mr. Shapiro's settlement demand—the settlement draft and proof of the policy limits—plaintiffs focus on the release sent with the acceptance letter that had Pamela as a releasee rather than a releasor, asserting it did not comport precisely with the demand letter. But this was obviously a mistake, demonstrated by two facts: the USAA acceptance letter said that the "spouse's signature is also required," and USAA sent Mr. Shapiro a corrected release.

*Panagotacos v. Bank of America* (1998) 60 Cal.App.4th 851 (*Panagotacos*), the primary case on which plaintiffs rely—and the only case relied on by the trial court—is distinguishable. The case involved the possible sale of real property located in Greece, and the sellers, who were located in Germany, specified that the payment be made in Germany and delivery of the money occur no later than April 15, 1994. On January 18, the prospective buyers wrote the sellers and enclosed a copy of the sellers' letter indicating their desire to buy the property. The letter, however, included the statement that " 'both parties will need an attorney in Greece where papers need to be signed and the money and title exchanged.' " (*Id.* at p. 853.) The sellers responded "that payment of the money occur in Germany was essential and that given [the prospective buyers'] remarks about payment in Greece, that they had failed to agree." (*Ibid.*) The parties continued to correspond for several months, and the buyers eventually offered to make payment in Germany, but specified a different deadline. (*Id.* at pp. 853–854.)

The buyers ultimately sued defendant bank, contending that its failure to reconvey a deed of trust from an earlier loan in a timely manner rendered

them unable to complete the loan transaction in time to buy the Greek property. (*Panagotacos*, *supra*, 60 Cal.App.4th at p. 854.) The bank obtained summary judgment, and the Court of Appeal affirmed, holding among other things that there was no enforceable contract to purchase the property, since the buyers had failed to accept the sellers' offer without making additional terms. (*Id.* at p. 856.) It was in that setting that the Court of Appeal used the language on which plaintiffs rely: " '[T]erms proposed in an offer must be met exactly, precisely and unequivocally for its acceptance to result in the formation of a binding contract . . . .' " (*Id.* at p. 855.)

Here, unlike in *Panagotacos*, USAA was not adding a new term to the offer. It did not want Pamela to be a releasee. In short, release of Pamela was not something USAA wanted, let alone insisted upon.

Indeed, a comment in the plaintiffs' own brief indicates that their position is misplaced. This is the comment: "Frankly, looking solely at the document [(i.e., the first release)] without the parole [*sic*] evidence, it would be more reasonable to conclude that Pamela Birdsall's signature codified her consent to Gary Birdsall taking all the insurance money leaving her free to pursue Barton Helfet's personal assets. Pamela Birdsall being released from responsibility for medical expenses by Gary Birdsall would be due consideration. This interpretation would also give meaning to naming Pamela Birdsall as a releasee which appellant's reading does not explain. *We of course know this alternate interpretation was not the intent of the parties from parole [sic] evidence.*" (Italics added.) Indeed: intent is the issue here. It is a fact question.

We find support for our conclusion in "well-established public policy" that settlements are favored and should be encouraged. (*Villa v. Cole* (1992) 4 Cal.App.4th 1327, 1338.) As Division Five of this court described it, quoting

13

two old Supreme Court cases: "Public policy has long supported pretrial settlements. 'Not only will such agreements, when there is no fraud, be sustained by the courts, but they are highly favored as productive of peace and goodwill in the community, and reducing the expense and persistency of litigation.' (*McClure v. McClure* (1893) 100 Cal. 339, 343.) In *Hamilton v. Oakland School Dist.* (1933) 219 Cal. 322, the Supreme Court reversed a judgment denying enforcement of a compromise, holding, 'It must be remembered that it is the policy of the law to discourage litigation and to favor compromises of doubtful rights and controversies, made either in or out of court.' (*Id.*, at p. 329.)" (*Gopal v. Yoshikawa* (1983) 147 Cal.App.3d 128, 130–131.)

In sum, we conclude—and it is all we conclude[2]—that the "outward manifestations" were such that they presented a triable issue of material fact such that a "reasonable person" could find consent—and thus the summary adjudication was error.

**A Closing Note**

As indicated in the introduction, Helfet makes two arguments on appeal, the second of which is that the trial court erred in precluding evidence of, and refusing to instruct on, Gary's failure to wear a seat belt. As Helfet's brief describes it, "[t]he trial court denied the seat belt defense because there was no offer of proof any expert would opine that Gary's injuries would have been less severe had he used a seat belt." The brief goes on to state that the trial court acknowledged there are cases holding that expert testimony is not needed, but, the brief further notes, there are cases

---

[2] Helfet's brief requests that we hold as a matter of law that there was a contract here, a heavy request in the best of circumstances. It is particularly inappropriate here where he did not file any motion below.

holding that it is.  We, of course, do not know what the evidence will be on any retrial, and thus do not address the argument.

## DISPOSITION

The judgment, the amended judgment, and the orders of May 6, 2024 are reversed, and the matter is remanded with instruction to the trial court to vacate its order granting summary adjudication and to enter a new order denying the motion.  Helfet is entitled to his costs on appeal.

_____

RICHMAN, J.

We concur.

_____

STEWART,  P. J.

_____

DESAUTELS, J.

(A170596N)